Frank W. SCROGGINS, Trustee in Bankruptcy for Air Transfer, Inc., Plaintiff-Appellant,

v.

AIR CARGO, INC., et al., Defendants-Appellees.

No. 75–1307.

United States Court of Appeals, Fifth Circuit.

July 8, 1976.

Rehearing and Rehearing En Banc Denied Oct. 4, 1976.

Candler Crim, Jr., Atlanta, Ga., for plaintiff-appellant.

Harold L. Russell, Thomas W. Rhodes, Atlanta, Ga., Russell S. Bernhard, Washington, D. C., for defendants-appellees.

Henry P. Willimon, Greenville, S. C., for Carolina Cartage.

Before COLEMAN, CLARK and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The three counts of the complaint in this case alleged respectively (1) a conspiracy in restraint of trade, in violation of Title 15, United States Code, Section 1, (2) monopolization and attempt to monopolize, in violation of Title 15, United States Code, Section 2, and (3) tortious interference with a contract under Georgia law. Jurisdiction over the two antitrust counts was based upon Title 15, United States Code, Section 15, and Title 28, United States Code, Section 1337. The district court took cognizance of the state law claim because of pendent jurisdiction and also because of complete diversity of citizenship. After considering the facts in the record, most of which were stipulated, the court granted summary judgment for defendants. In the court's view, the alleged conduct was immunized from antitrust liability because it fell within an area which the Civil Aeronautics Board (CAB) was regulating pursuant to the Federal Aviation Act (FAA), Title 49, United States Code, Section 1301 *et seq.* As to the state law claim, the trial court felt that the parties' contract had explicitly authorized the actions complained of. Final judgment was entered in favor of defendants on December 31, 1974, and plaintiff appealed both this disposition of the lawsuit and an earlier order limiting discovery. On February 12, 1975, the court overruled plaintiff's objections to the bill of costs; and, thereafter, plaintiff amended his Notice of Appeal to include that ruling as a third basis for appeal. We affirm in all respects.

I

## FACTUAL BACKGROUND

*The Parties.* Plaintiff is the trustee in bankruptcy for Air Transfer, Inc. (ATI), a trucking company which from 1947 until its bankruptcy in 1972 picked up and delivered air cargo at Hartsfield International Airport in Atlanta, Georgia. The chief defendant, Air Cargo, Inc. (ACI), is a wholly-owned subsidiary of all CAB-certified airlines and was formed in 1947 to serve as the airlines' agent in the handling of air cargo. The ten certified airlines which carry air cargo to or from the Atlanta airport are also defendants in this case. The other defendant is Carolina Cartage, Inc. (Carolina Cartage), which is currently the only trucker providing air cargo pick-up and delivery service at the airport.

*History of ACI.* Faced with the rapid development of the air cargo business after World War II, the various CAB-certified airlines decided to coordinate the movement of such cargo on the ground. In 1947, by a written agreement, they created ACI as a joint agent of all the airlines, with the responsibility of securing the necessary cargo-handling services. Among its duties was that of "[p]roviding, directly or by contract, pick-up and delivery services at all points within the continental United States served by any party [to the agreement] . . . ."[1] Other provisions of the agreement conferred upon ACI the power to negotiate contracts with third parties for the pick-up

---

1. Agreement Among Certain Air Carriers Relating to Air Cargo Services, dated March 1, 1947, Section 7(b).

and delivery of air cargo.[2] Under the Civil Aeronautics Act of 1938,[3] the airlines were required to submit this agreement for CAB approval. The agreement was duly filed on April 14, 1947, and approved by the CAB in an order dated December 31, 1947.[4] The Board expressly found that the agreement was not contrary to the public interest. However, the order also announces the Board's intention to re-examine the ACI arrangement if future circumstances should so require:

> The Board further find[s] that the future development of Air Cargo, Inc. is uncertain and that its activities may require future reconsideration of the approval granted herein.

In the public interest, the Board made its approval contingent upon several conditions. One of these was a requirement that ACI and the member airlines supply the Board with whatever documents and information concerning ACI the Board's Economic Bureau might request. Another condition was that any CAB-certified airline should be allowed to participate in ACI as a matter of right. A controversy over this latter condition led the Board to clarify its conception of the public interest. After two of the member airlines petitioned the

CAB to reconsider this condition, a more comprehensive order and opinion issued on September 2, 1948.[5] Therein, the Board pointed out its statutory duty to scrutinize proposed agreements in order to ascertain whether the public interest was adequately protected.[6] Concerns about possible future anticompetitive developments loomed large in the Board's opinion. Particular emphasis was placed upon the "sound public policy" represented by the federal antitrust laws, as interpreted in decisions of the United States Supreme Court. Relying upon cases such as *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), the Board demonstrated its sensitivity to the anticompetitive dangers posed by the type of concerted action which the ACI agreement represented. In the Board's view, the public interest required "the fullest future air carrier admission and participation [in ACI] upon an equitable basis." However, the Board noted that it would consider future airlines' applications for ACI admission individually, in light of the then existing circumstances.

After the 1947 agreement became effective, ACI acted swiftly to carry out its duties. It chose to enter into contracts with local trucking companies near each

---

**2.** Section 7 of the agreement included the following provisions:

> Each of the parties hereby confers upon Air Cargo, Inc. full power and authority, on its behalf, subject only to a limitation upon payment that may be due for services in the several amounts set forth hereinafter in this paragraph 7, to negotiate and execute agreements or arrangements (if any only if any such agreement or arrangement confers the right on the parties thereto and Air Cargo, Inc. to cancel the agreement or arrangement on not more than sixty days' notice), and to renew, modify, cancel, or terminate in accordance with the terms hereof, any existing arrangement, by or between any of the parties hereto and any other party or parties engaged in performing under contract pick-up and delivery or other services with respect to the handling of air freight, air cargo, or air express (including, without limitation, the Air Express Agreement between the respective parties and the Railway Express Agency, Inc.), provided, however, that insofar as the foregoing delegates authority to cancel or terminate any existing arrange-

ments which have heretofore been filed with and approved by the Civil Aeronautics Board, the exercise thereof shall be subject to either (a) approval of the cancellation or termination of such an existing arrangement by the Civil Aeronautics Board, or (b) the approval of this agreement by the Civil Aeronautics Board . . .

Attached to this agreement was a sample contract to be entered into between ACI and the individual airlines. Sections 1(b) and 2(a) of the contract made it clear that ACI was to enter into contracts on behalf of the airlines for the provision of pick-up and delivery services.

**3.** The applicable provision appears in substance as Section 412 of the present FAA, Title 49 United States Code, Section 1382.

**4.** CAB Order No. E–1086 (1947).

**5.** Both the order and the opinion accompanying it were given the serial number E–1930.

**6.** See Title 49, United States Code, Section 1382, the text of which appears *infra*.

airport rather than to provide pick-up and delivery services itself. All CAB-certified airlines today are participating in ACI, and ACI operates at every airport where these airlines deliver or receive air cargo. Generally, the practice of ACI has been to deal with only one trucker at each airport. However, the standard contracts between ACI and local trucking companies have never contained an exclusive dealing provision, and occasionally ACI has taken advantage of this fact by contracting with more than one trucker at a particular airport. Before 1962, ACI was required to file with the CAB copies of each contract between it and local truckers. In that year, this requirement was terminated, although the CAB still must approve every amendment to the 1947 agreement between ACI and the airlines. Also, ACI must still file with the CAB a schedule of the rates for the truckers' pick-up and delivery services. Subsequent to 1962, a number of the contracts between ACI and local trucking companies have been amended to make explicit what was implicit in earlier agreements, i. e., that ACI had the right to deal with more than one trucking company, and apportion its business among them as it saw fit.[7]

*Relationship between ACI and ATI.* With this general background in mind, the relationships among these parties becomes clear. In 1947, ATI and ACI executed the standard contract for pick-up and delivery services in Atlanta. This specific agreement was approved by the CAB on April 20, 1949, with an express finding that the agreement was not adverse to the public interest.[8] Further amendments to the ACI–ATI contract approved at various

times prior to the termination of the filing requirement in 1962.[9] Thereafter, the parties' contracts were renewed and (at times) amended without specific CAB approval. In accordance with ACI's nationwide practice, none of these contracts has contained an exclusive dealing provision. Furthermore, all of these contracts have been terminable by either party upon notice.[10] The contractual tie between ACI and ATI lasted until May 1, 1972. For almost this entire period, until December 5, 1971, ATI was the sole contracting trucker at the Atlanta airport.

At least so far as the record reflects, the parties' relationship was good until 1971. On January 11 of that year, ATI asked ACI for an increase in the rates under the current annual contract, which had become effective only two months earlier and was not due for renewal until November 1, 1971. Discussions then ensued between ACI and the participating airlines. The airlines informed ACI that they were dissatisfied with ATI's services and that they would not approve the rate increase unless improvements were forthcoming. Thereupon, a team of ACI experts investigated the Atlanta operation and presented a list of changes which were necessary to bring ATI's services into accordance with the terms of the parties' contract. Under ACI's supervision, most of the specified improvements were made, and an amended contract reflecting a rate increase became effective September 1, 1971. The September 1, 1971 contract also added a provision expressly giving ACI the right to deal with other truckers and to divide its business among

---

7. The pertinent portion of the amendment states:

 [T]he Company and the Air Carriers shall have the right to employ additional parties to compete with Contractor in providing pick-up, delivery, and transfer services for all or any part of the air freight traffic moving between the points covered by this Contract, and in such event nothing herein shall be construed as guaranteeing to Contractor any share of such traffic.

8. CAB Order No. E–2740 (1949).

9. See, e. g., CAB Order No. E–11678 (1957); CAB Order No. E–13601 (1959).

10. The provisions of the termination clause have varied over the years. Prior to 1964, either party could terminate the contract at will upon 45 days' notice. In that year, the contract was amended to make it automatically renewable every year, with either party having a right of termination by written notice 60 days prior to the date of renewal. Also, in 1964 a provision was added allowing cancellation for cause, upon notice and an opportunity to correct the default.

the contracting truckers as it saw fit. As has been mentioned *supra*, ACI had introduced this provision into a number of other contracts by this time, although this was its first appearance in an ACI–ATI agreement. Soon thereafter, at the airlines' request, ACI entered into an additional contract with another trucker, Carolina Cartage, Inc. This contract became effective December 5, 1971. Carolina Cartage quickly received most of the airlines' cargo business, and the volume of cargo handled by ATI showed a corresponding decline. ATI's financial situation grew steadily worse until it filed a bankruptcy petition on April 21, 1972. When ACI received a copy of this petition on May 1, 1972, it terminated its agreement with ATI pursuant to a contract provision.

*ATI's Allegations.* This complaint was filed on November 14, 1973. Even under the most liberal reading, the factual substance of the two antitrust counts is merely that the defendants (a) behaved unreasonably with respect to the rates granted to, and costs imposed upon ATI, (b) effectively terminated the ACI–ATI contract, and (c) substituted Carolina Cartage as the exclusive contractor.[11] The facts alleged in the third count are similar, though they provide somewhat greater detail in describing the alleged unfairness of the procedures which resulted in the diversion of business from ATI to Carolina Cartage.[12]

11. The pertinent portion of Count One is as follows:

Defendant ACI, defendant airlines, and defendant Carolina Cartage, Inc., have combined, contracted and conspired to unreasonably restrain the pick-up and delivery of domestic air freight in commerce in the metropolitan area of the City of Atlanta by unfair business practices including but not limited to, the following acts, to-wit:

(a) Attempting to and utilizing defendant Carolina Cartage, Inc. as the sole carrier for the pick-up and delivery of domestic air freight in commerce to the exclusion of other carriers including ATI;

(b) Unfairly fixing the cost of pick-up and delivery of domestic air freight by exerting economic pressure on carriers who contract with ACI, including, but not limited to, ATI;

(c) Entering into unreasonable exclusive contracts which are contra to public policy and which operate as a restraint on competition;

(d) Engaging in unreasonable and arbitrary requirements that carriers with which ACI contracts and has contracted incur exorbitant expenses for insurance, equipment, trucks, management personnel, additional facilities, etc., reducing the profits of said carriers, and then cancelling, unilaterally, arbitrarily, and without cause, ACI's contracts with said carriers.

In Count Two, the alleged monopolistic actions are thus described:

Defendant ACI, defendant airlines, and defendant Carolina Cartage, Inc. have willfully and deliberately attempted to and have willfully and deliberately monopolized the entire market of pick-up and delivery of domestic air freight in commerce in the metropolitan area of the City of Atlanta by monopolistic business practices including, but not limited to, the following acts, to-wit:

(a) Attempting to and utilizing defendant Carolina Cartage, Inc. as the sole carrier for the pick-up and delivery of air freight in commerce to the exclusion of other carriers including ATI;

(b) Unfairly fixing the cost of pick-up and delivery of domestic air freight by exerting economic pressure on carriers who contract with ACI including but not limited to, ATI;

(c) Entering into unreasonable exclusive contracts which are contra to public policy and which operate as a restraint on competition;

(d) Engaging in unreasonable and arbitrary requirements that carriers with which ACI contracts and has contracted to incur exorbitant expenses for insurance, equipment, trucks, management personnel, additional facilities, etc., reducing the profits of said carriers and then cancelling, unilaterally, arbitrarily and without cause, ACI's contracts with said carriers;

(e) Attempting and using ACI's position as agent of the airlines and an independent entity to deliberately monopolize the domestic air freight pick-up and delivery of air freight in commerce for ACI's exclusive benefit and profit.

12. The conduct alleged to constitute tortious interference with a contract is described in Count Three as follows:

"33. ATI initially obtained a contract with ACI to perform pick-up and delivery of domestic air freight in the metropolitan area of the City of Atlanta in 1947, and was renewed on each anniversary date, for one-year periods up to and including September 1, 1971.

34. Pursuant to said contract as amended and renewed from time to time, ATI was employed by ACI and defendant airlines for the shipment of air freight in the metropolitan area of the City of Atlanta, and at all times ATI was ready, willing and able to

# 1130

## II

### IMMUNITY

 The district court held that the defendants' alleged activities were immunized from antitrust liability by the pertinent provisions of the FAA and by CAB action taken pursuant to these provisions. We agree. Two sections of the FAA are pertinent here. The first is Section 412, Title 49, United States Code, Section 1382:

(a) Every air carrier shall file with the Board a true copy, or, if oral, a true and complete memorandum, of every contract or agreement (whether enforceable by provisions for liquidated damages, penalties, bonds, or otherwise) affecting air transportation and in force on the effective date of this section or hereafter entered into, or any modification or cancellation thereof, between such air carrier and any other air carrier, foreign air carrier, or other carrier for pooling or apportioning earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, or for preserving and improving safety, economy, and efficiency of operation, or for controlling, regulating, preventing, or otherwise eliminating destructive, oppressive, or wasteful competition, or for regulating stops, schedules, and character of service, or for other cooperative working arrangements.

(b) The Board shall by order disapprove any such contract or agreement, whether or not previously approved by it, that it finds to be adverse to the public interest, or in violation of this chapter, and shall by order approve any such contract or agreement, or any modification or cancellation thereof, that it does not find to be adverse to the public interest, or in violation of this chapter; except that the Board may not approve any contract or agreement between an air carrier not directly engaged in the operation of aircraft in air transportation and a common carrier subject to the Interstate Commerce Act, as amended, governing the compensation to be received by such common carrier for transportation services performed by it.

The other relevant statute is Section 414 of the same Act, Title 49, United States Code, Section 1384:

Any person affected by any order made under sections 1378, 1379, or 1382 of this title shall be, and is hereby, relieved from the operations of the "antitrust laws", as designated in section 12 of Title 15, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to en-

---

perform said services and, in fact, did perform said service.

35. ATI performed and fulfilled all of its duties and obligations under said contract as amended and renewed from time to time.

36. On or about February 12, 1971, ACI inspected ATI's premises and demanded that ATI expend substantial sums of money for, among other things, upgrading its service, equipment, management, physical premises and security.

37. ATI undertook to perform these improvements at great cost to itself on the information and belief that its contract with ACI would be terminated if the requirements were not met.

38. During said period in which ATI was to comply with said requirements, ACI imposed a penalty against ATI of 10 cents per shipment or 5 cents per hundred, said penalty being neither authorized nor justified by the contract between ACI and ATI.

39. On June 12, 1971, ACI removed the penalty against ATI, admitting that ATI had met the truck and driver requirements.

40. On December 6, 1971, ACI contracted with Carolina Cartage, Inc. to perform pick-up and delivery of domestic air freight in the metropolitan area of the City of Atlanta and diverted roughly 100% of the pick-up and delivery of air freight to Carolina Cartage, Inc., and ATI received virtually no freight for approximately thirty days.

41. Thereafter, ACI caused the defendant airlines to: (a) Refuse to tender any air freight to ATI although ATI was at all instances ready, willing and able to handle such air freight; (b) To boycott ATI, tendering all but a small proportion of their pick-up and delivery of air freight to Carolina Cartage, Inc.

42. Said course of conduct was a tortious interference with the present and prospective business relationship of ATI and defendant airlines."

able such person to do anything authorized, approved, or required by such order. We hold that the conduct alleged by plaintiff falls squarely within the reach of these statutes, as it is conduct which is "authorized" or "approved" by the CAB's order of December 31, 1947, and by subsequent orders re-affirming the functions conferred upon ACI in 1947. Our attention is drawn to the fact that the CAB has not specifically approved the course of dealings between the parties in 1971 and 1972. However, our conclusion is that such individualized approval is not necessary for antitrust immunity, so long as the alleged conduct is clearly within the contemplation of prior CAB orders. Thus, contrary to plaintiff's contention, *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), does not hold that specific approval of each alleged activity is necessary for Section 414 immunity. Rather, it suffices if the alleged conduct is "the *kind* of conduct the CAB . . . [has] approved and authorized for the future . . . " *Id.* at 388–89, 93 S.Ct. at 661 (emphasis supplied). We feel that this requirement has been met in the present case. The CAB's order of December 31, 1947 gave ACI full power to negotiate with trucking companies for the pick-up and delivery of air cargo. There was no restriction upon the number of truckers with which ACI could deal, nor was there any requirement that the business at individual airports be apportioned among contracting truckers in any particular way. Contracts lacking such restrictions were routinely approved by the CAB between 1947 and 1962, without even the slightest suggestion that the public in-

terest was prejudiced.[13] Such matters were evidently to be left to ACI's discretion. Insofar as the antitrust counts in ATI's complaint allege that ACI added Carolina Cartage as a competitor and diverted the bulk of the Atlanta business to it, such conduct is clearly within the authority conferred by the 1947 order. The only remaining allegations of the antitrust counts criticize ACI's handling of the rates granted to ATI, and the costs imposed upon ATI by ACI's insistence that ATI make certain improvements. The ability to negotiate rates and to deal with truckers concerning changes to be made in the latter's operations is clearly included in the power which ACI has under the 1947 order to act as the joint contracting agent of the airlines. Indeed, it is difficult to see how ACI could perform as the airlines' plenipotentiary in dealing with truckers without the capacity to negotiate with the truckers concerning their rates and operations. We therefore feel that, under the allegations of the complaint, ACI was merely acting within the scope of the authority conferred by the 1947 order, and this part of the *Hughes* test is therefore satisfied.

■ In our view, the Supreme Court's opinion in *Hughes* requires one further inquiry. The *Hughes* Court did not base its decision purely upon the prior CAB orders which had authorized the type of conduct complained of. In addition, the Court was careful to note that under Section 415 of the FAA, Title 49, United States Code, Section 1385,[14] the CAB was exercising continuing jurisdiction over the affected area of operations.[15] It can scarcely be doubted,

---

**13.** Indeed, in Local Cartage Case, 15 CAB 850, 861–62 7 n. 15 (1952), the Board noted that ACI customarily dealt with only one trucker per airport, although several airports were served by more than one contractor. There is nothing to indicate that the Board saw anything wrong with either alternative. In our view, the Board's observations on this point tend to reinforce a conclusion that the number of contracting truckers was contemplated in 1947 as a matter within the discretion of ACI.

**14.** The text of Section 415 follows:

For the purpose of exercising and performing its powers and duties under this chapter, the Board is empowered to inquire into the management of the business of any air carrier and, to the extent reasonably necessary for any such inquiry, to obtain from such carrier, and from any person controlling or controlled by, or under common control with, such air carrier, full and complete reports and other information.

**15.** [T]he ongoing supervision entrusted to the CAB by Section 415 is broad enough to put all transactions between parent and subsidiary— as originally conceived or subsequently exer-

and plaintiff does not dispute the fact, that the operations of ACI as the airlines' joint agent is a matter of air carrier management within the ambit of the supervisory powers conferred by Section 415. Furthermore, the Board unquestionably has the power to amend its prior orders under Section 204(a) of the Act, Title, 49 United States Code, Section 1324(a). See *Hughes, supra,* 409 U.S. at 382–83, 93 S.Ct. 647. Plaintiff does not contest these points. Rather, the Board is alleged to have abandoned its continuing supervision in 1962, when it ended the requirement that each contract between ACI and local truckers be submitted for approval. We cannot accept this contention. The CAB has continued to scrutinize every amendment to the contract which defines ACI's rights and duties, and has approved the revised contracts only when found not to be adverse to the public interest. The initial CAB orders of December 31, 1947, and September 2, 1948, show a very lively interest in the possible anticompetitive effects of the agreement which the Board was approving. Specific changes were ordered to minimize these risks. The Board also announced that it would reconsider its approval if the future development of ACI should so warrant. We see not the slightest reason to think that the Board's concern with anticompetitive consequences and its intention to review ACI's operations in light of new developments have somehow disappeared. In our view, unfair and anticompetitive conduct by ACI *vis-a-vis* contracting truckers is the very sort of development which the Board has served notice that it would consider. We therefore feel that the continuing supervision element of *Hughes* has been met as well.

 Our holding, then, is that the conduct alleged in this complaint is immunized from antitrust liability because (a) the actions complained of were within the contemplation of prior CAB orders which specifically considered effects upon future

competition and (b) the CAB has retained an active supervisory jurisdiction to correct anticompetitive developments as they arise. The cases cited by plaintiff do not suggest a contrary test. In *Breen Air Freight, Ltd. v. Air Cargo, Inc.,* 470 F.2d 767 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973), the operative fact was that the conduct charged to ACI (promotion of a trucking company in which ACI held an ownership interest) was not contemplated by the CAB's order of December 31, 1947. *Id.* at 774. A similar holding is found in *Foremost Int'l Tours, Inc. v. Quantas Airways, Ltd.,* 379 F.Supp. 88, 94 (D.Haw.1974). The case of *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.,* 489 F.2d 203 (9th Cir. 1973), *cert. denied,* 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974), is even further removed from the facts of the present case. In *Aloha,* there were no prior CAB orders at all which even allegedly dealt with the conduct complained of. Rather, the defendant sought antitrust immunity purely on the basis of the CAB's power to investigate unfair competitive practices.[16] *Id.* at 208. We feel, then, that these other authorities are entirely consistent with the two-part test for immunity which we have derived from the Supreme Court's decision in *Hughes.*

### III

### THE STATE LAW CLAIM

 The complaint also raises a claim that the defendant airlines and ACI tortiously interfered with a contract.[17] The parties at times refer to this claim as one for breach of contract. The confusion is understandable, as the contract in question is the contract which ACI negotiated with ATI on behalf of the airlines. Thus, ACI and the airlines are charged with having tortiously interfered with the performance of their own contract. However he characterizes this claim, we agree with the district

cised—under CAB supervision. 409 U.S. at 387–88, 93 S.Ct. at 661.

**16.** See Title 49, United States Code, Section 1381.

**17.** Unlike the two antitrust counts, Count Three of the complaint seeks relief only against ACI and the airlines, not Carolina Cartage. See Volume One, Record on Appeal, at p. 13.

court that the parties' contract authorized the conduct alleged in Count Three, and that therefore no action can be based upon an allegation that the contract was not observed. Count Three alleges no more than that the defendants diverted most of ATI's business to Carolina Cartage despite the fact that ATI had performed its duties under the contract. As should be evident from the factual recitations *supra*, this course of conduct was specifically authorized by the parties' contract of September 1, 1971. Furthermore, as we have noted, the parties' prior contracts would also have authorized the addition of another trucker and the diversion of business to it. Since the alleged conduct was completely consistent with the parties' contractual arrangement, we see no possible merit in this claim.[18] Cf. *Putnam v. Air Transport Ass'n*, 112 F.Supp. 885, 888–89 (S.D.N.Y.1953).

## IV

### OTHER ISSUES

■ *Discovery Order.* Soon after the complaint was filed, plaintiff embarked upon an extensive discovery program, largely in the form of requested depositions and documents. Upon defendants' motions, on February 13, 1974, the trial court entered a protective order which in effect limited discovery to the matters raised by defendants' motion for summary judgment, i. e., the immunity issue and the nature of the CAB's regulation of ACI. Eventually, as we have seen, the disposition of this summary judgment motion terminated the lawsuit without putting the parties to the expense of conducting broad discovery on all issues raised in the complaint. We have

constantly emphasized the broad discretion which a district judge may properly exercise in discovery matters. See, e. g., *Swanner v. United States*, 406 F.2d 716, 719 (5th Cir. 1969). On these facts, we see no possible abuse of discretion in the order staying general discovery until the court could determine whether the case would be resolved at the summary judgment stage. Of course, the situation would be quite different if plaintiff had been denied discovery which related to the summary judgment motion, but plaintiff has failed to persuade us that such was the case.

■ *Copying Costs.* The trial court allowed defendants to tax costs in the amount of $91.50, and overruled plaintiff's objections to these costs. The record reveals that these costs were for the copying of various exhibits and documents. Certain of these copies were presented to the trial court pursuant to the court's orders. The others were likewise copies of exhibits and documents and were prepared for the court's consideration of the motion for summary judgment. It was well within the court's discretion to conclude that these copies were "necessarily obtained for use in the case," Title 28, United States Code, Section 1920(4). We find no abuse of the court's broad power to tax costs under Rule 54(d) of the Federal Rules of Civil Procedure.

## V

### CONCLUSION

For the foregoing reasons, the judgment and orders appealed from are AFFIRMED.

---

**18.** Plaintiff has not persuaded us that the September 1, 1971 contract was coerced. Since the 1971 amendment merely made explicit ACI's pre-existing right to deal with additional truckers, we fail to see any indicia of coercion in the circumstances surrounding this contract.

No authority has been cited which would stretch the law of unconscionable contracts far enough to cover a provision which added nothing new to an existing contractual relationship of unchallenged validity.