**HARRISON AIRE, INC., Plaintiff,**

v.

**AEROSTAR INTERNATIONAL, INC., and Raven Industries, Inc., Defendants.**

**No. CIV.A.02–1258.**

United States District Court, E.D. Pennsylvania.

April 30, 2004.

John K. Weston, Sacks Weston Smolinsky Albert & Luber, LLC, Philadelphia, PA, for Plaintiff.

Jeffrey A. Oshin, Hardin, Jundla, Mckeon, et al., John F. Mc Keon, Springfield, NJ, for Defendants.

### MEMORANDUM

BAYLSON, District Judge.

## I. Jurisdiction, Procedural Background, and Summary

Plaintiff Harrison Aire, Inc., an owner and operator of hot air balloons, filed this action on March 12, 2002, alleging that Defendants Aerostar International, Inc. and Raven Industries, Inc. (Aerostar's corporate parent) operated their hot air balloon business in violation of Sections 1 and 2 of the federal antitrust laws. 15 U.S.C. §§ 1 & 2. Plaintiff also makes state law allegations of fraud and negligence. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331, 1332, and 1337 and 15 U.S.C. § 15. Venue is proper under 28 U.S.C. § 1391(b). Presently before the Court is Defendants' Motion for Summary Judgment (Docket No. 12). The Court held oral argument on January 27, 2004, and the parties submitted supplemental briefs on April 2, 2004.

Defendants move for summary judgment on three grounds. For the reasons which follow, Defendants' motion will be granted, and the Court summarizes its rulings as follows:

One: Defendants' contention that Plaintiff's antitrust claim is barred by the four-year statute of limitations applicable to antitrust claims is rejected as presenting an issue of fact. (*See infra* pp. 202–203.)

Two: Defendants claim that summary judgment is warranted upon application of implied immunity to Plaintiff's antitrust claims is rejected as a matter of law. (*See infra* pp. 205–206.)

Three: Defendants argue that Plaintiff cannot succeed in proving the requisite elements for its antitrust, fraud, or negligence claims, thus justifying summary judgment against Plaintiff. The Court concludes that Plaintiff has not adduced sufficient facts to warrant a trial on its antitrust claims and the Court will grant summary judgment for Defendants, as to Counts I and II. (*See infra* pp. 213–224.)

## II. Factual Background

### A. Description of Parties and Ballooning Industry [1]

Plaintiff Harrison Aire, Inc. is a New Jersey corporation in the business of providing commercial balloon hot air rides, aircraft maintenance, and pilot training for hot air balloons and fixed wing aircraft. (Defs.' Undisputed Facts ¶ 2.) Its sole owner and proprietor is Terry Harri-

---

1. The record on Defendants' Motion consists of excerpts of depositions of Plaintiff's President, Defendants' employees, three Federal Aviation Administration officials, and three other witnesses with experience in the hot air balloon industry. Defendants have submitted excerpts of their hot air balloon maintenance manuals, some correspondence between the FAA and a third party (Ronald DiGiovanni), a recent company newsletter, and a letter subsequently sent to the newsletter's mailing list that listed corrections to the newsletter. Defendants also have filed two affidavits both sworn by Mark West, President of Aerostar. Plaintiff has submitted an actuarial-economic consultants' report. Plaintiff has not filed any affidavit.

son.[2] Defendant Aerostar International, Inc. is a hot air balloon manufacturer located in South Dakota. Aerostar International is a wholly owned subsidiary of Raven Industries.[3] Raven Industries preceded Aerostar International in the manufacture of hot air balloons, but formed Aerostar International in 1986 for the purposes of undertaking the hot air balloon aspect of the company's business. (*Id.* ¶ 6.) Raven Industries has not manufactured hot air balloons since February 1986; rather, Aerostar International, as its wholly owned subsidiary, has fulfilled that role. (Compl.¶ 14.) During the 1970s and 1980s, Harrison Aire purchased hot air balloons for its flight operations from Raven Industries, and subsequently from Aerostar Industries.

Hot air balloons are comprised of three principal components: the basket (which contains the balloon's instruments and occupants); the fuel and heater system (which produces the hot air); and the envelope (which contains the hot air). (Compl.¶ 10.) With use and age, balloon envelopes deteriorate, with the top hemisphere of the envelope deteriorating much more quickly than the lower hemisphere. (*Id.* ¶ 12.) After approximately 300–500 hours of use (actual mileage may vary), because of this deterioration, at least the upper portion of the envelope must be replaced in order to continue piloting safely. (*Id.*) This replacement typically extends the life of the envelope for another 200–300 hours. (*Id.*) In general, replacement of the fabric in the upper hemisphere of the envelope is significantly less costly than replacement of the entire envelope. Because of design and wear patterns, replacement of up to 80% of the envelope fabric (somewhat more than the top half of the envelope) is generally most practical and economical. (*Id.* ¶ 13.)

## B. Federal Regulations Applicable to Hot Air Ballooning

At the heart of this case are issues regarding replacement fabrics for the envelope for Raven/Aerostar hot air balloons. Although these issues were present in the 1980s, the present case centers on events beginning in late 1995 or early 1996. Plaintiff needed to buy replacement fabric for one of its Raven/Aerostar balloons, and believed the balloon's accompanying manual restricted its abilities to purchase replacement fabric. The plaintiff contends that the defendants issued fraudulent statements that purportedly required the users and owners of Defendants' hot air balloons to buy replacement fabric from the defendants, whose fabric was more expensive than third-party fabric. The defendants, on the other hand, assert that federal regulations did require that owners of Raven/Aerostar hot air balloons had to purchase replacement fabric from either Defendants or a limited number of entities that made replacement fabric in satisfaction of Defendants' standards. Thus, in

---

**2.** Mr. Harrison has been involved in aviation for several decades. He holds a variety of licenses and certifications qualifying him to fly hot air balloons and fixed wing aircraft. Mr. Harrison is a former flight engineer and co-pilot for Eastern Airlines. He is a licensed FAA Airframe and Powerplant mechanic with inspection authority. This certification authorizes him to perform maintenance work on many types of aircraft, including hot air balloons. He served ten years as an accident prevention counselor and designated pilot examiner. (Harrison Dep., Defs.' Ex. B, at 12–16; Defs.' Undisputed Facts ¶ 3.)

**3.** Although no suggestion has been made that Aerostar and Raven have conspired to violate the antitrust laws, the Court notes that a parent company and its wholly owned subsidiary are incapable of conspiring with each other for antitrust purposes. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

understanding the regulatory parameters of this case, the Court first sets out the federal regulations at issue.

## 1. Manufacturer–Provided Instructions for Balloon Owners: Instructions for Continued Airworthiness and Airworthiness Limitations Section

Ballooning in the United States is regulated by the Federal Aviation Administration, which has promulgated regulations—the Federal Aviation Regulations or the Federal Rules of Aviation ("FARs")—that apply *inter alia* to the replacement of balloon envelope fabric. The regulations generally require that major balloon repairs, such as the replacement of significant areas of envelope fabric, be performed by a repairman or mechanic certified by the FAA. Since 1980, FAA regulations require balloon manufacturers to publish a maintenance manual for their product; this manual is known as "Instructions for Continued Airworthiness" ("ICA"). 14 C.F.R. § 31.82.[4] Section 31.82 provides:

> The applicant must prepare Instructions for Continued Airworthiness in accordance with Appendix A to this part that are acceptable to the Administrator. The instructions may be incomplete at type certification if a program exists to ensure their completion prior to delivery of the first balloon or issuance of a standard certificate of airworthiness, whichever occurs later.

*Id.*[5] A hot air balloon manufacturer must provide this model-specific ICA to each purchaser of its product. 14 C.F.R. § 21.50. Section 21.50 provides in pertinent part:

> (b) The holder of a design approval, including either the type certificate or supplemental type certificate for an aircraft ... shall furnish at least one set of complete Instructions for Continued Airworthiness, prepared in accordance with [§ 31.82] to the owner of each type of aircraft ... upon its delivery, or upon issuance of the first standard airworthiness certificate for the affected aircraft, whichever occurs later, and thereafter make those instructions available to any other person required by this chapter to comply with any of the terms of these instructions.

*Id.*

Generally, the maintenance standards and procedures specified in the ICA are permissive in nature ("FAA accepted") in that maintenance personnel may substitute other "FAA accepted" maintenance standards and procedures. 14 C.F.R. § 43.13. Section 43.13 provides in relevant part:

> (a) Each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, *or other methods, techniques, and*

4. The regulations cited within this section have been in effect since 1980 or earlier.

5. The aircraft manufacturer holds the "type certificate" for the aircraft, which constitutes the FAA's approval of the design of the aircraft. (Pl.'s Undisputed Facts ¶ 49.) The FARs establish the procedure for securing type certification for new aircraft designs, from the manufacturer's own analysis and testing of the design to the FAA's review of

those engineering data before determining airworthiness. 14 C.F.R §§ 21.11–21.53. "[E]very aircraft that's out there with an airworthiness that's flying around needs to be type certificated or receive a type certificate from the FAA, essentially saying that the design complies with the airworthiness regulation." (Michalik Dep., Pl.'s Ex. D & Defs.' Ex. G, at 9.)

*practices acceptable to the Administrator, except as noted in § 43.16 . . . .*

(b) Each person maintaining or altering, or performing preventive maintenance, shall do that work in such a manner and use materials of such a quality, that the condition of the aircraft, airframe, aircraft engine, propeller, or appliance worked on will be at least equal to its original or properly altered condition . . . .

*Id.* (emphasis added).

However, if a manufacturer or the FAA chooses to require a particular maintenance standard or procedure, that particular standard or procedure must be published in a separate and distinct portion of the ICA, known as the Airworthiness Limitations Section ("ALS"). Part A31.4 of Appendix A to Part 31—Instructions for Continued Airworthiness defines the ALS portion and specifies how the manufacturer should present the ALS to the balloon owner. Part A31.4 reads:

The Instructions for Continued Airworthiness must contain a section titled Airworthiness Limitations that is segregated and clearly distinguishable from the rest of the document. This section must set forth each mandatory replacement time, structural inspection interval, and related structural inspection procedure, including envelope structural integrity, required for type certification. If the Instructions for Continued Airworthiness consist of multiple documents, the section required by this paragraph must be included in the principal manual. This section must contain a legible statement in a prominent location that reads: *"The Airworthiness Limitations section*

*is FAA approved and specifies maintenance required under §§ 43.16 and 91.403 of the Federal Aviation Regulations."*

*Id.* (emphasis added). In contrast to an ICA's maintenance standards, which may be replaced by other "FAA accepted" maintenance procedures, maintenance personnel are required to adhere strictly to the provisions of an Airworthiness Limitations Section, if one exists. 14 C.F.R. § 43.16. Section 43.16 states in relevant part, "Each person performing an inspection or other maintenance specified in an Airworthiness Limitations section of a manufacturer's maintenance manual or Instructions for Continued Airworthiness shall perform the inspection or other maintenance in accordance with that section . . . ." *Id.*

**2. Replacement Parts for Hot Air Balloons**

The FAA also has instituted a regulatory scheme that governs the manufacture and sale of replacement parts. When the FAA approves an aircraft, it issues a type certificate under Part 23 of its regulations. 14 C.F.R §§ 21.11–21.53. For example, as a type certificate would be for the whole aircraft (*e.g.*, Waligunda Dep., Pl.'s Ex. F, at 21) [6], Defendants would hold the type certificate for each of their separate hot air balloon designs. The FAA must also approve modifications to a particular aircraft, whether designed by the original manufacturer or a third-party, after which the FAA issues a supplemental type certificate ("STC"). 14 C.F.R. § 21.113. An STC would enable its holder to manufacture a component or a part for a balloon system, e.g., a balloon envelope. (Waligunda Dep.,

---

**6.** Robert Waligunda was a distributor for Defendants for a number of years. Defendants terminated him allegedly because he "blew the whistle" regarding Defendants' purportedly deceptive manual. (Waligunda Dep.,

Pl.'s Ex. F, at 66.) Mr. Waligunda is an experienced hot air balloonist, having been involved in the industry for thirty-five years and having logged over 5000 hours in flight. (*Id.* at 19–20.)

Pl.'s Ex. F, at 20; DiGiovanni Dep., Pl.'s Ex. B, at 26–27.) Any person, in addition to the original manufacturer, may petition the FAA for a Parts Manufacturer Approval ("PMA"), which allows the holder to manufacture and sell specific replacement parts directly to aircraft owners. 14 C.F.R. § 21.303 ("[N]o person may produce a modification or replacement part for sale for installation on a type certificated product unless it is produced pursuant to a Parts Manufacturer Approval . . . ."). A PMA covers a part, such as the balloon fabric itself. (Waligunda Dep., Pl.'s Ex. F, at 21; DiGiovanni Dep., Pl.'s Ex. C, at 27–28.)

█ The Court concludes that the regulatory language makes clear the FAA has created a mechanism by which third-parties can be approved to manufacture and sell replacement parts for hot air balloons. The FARs do not mandate that replacement fabric has to be of the same manufacture as the balloon, nor could any manufacturer impose such a requirement in their ICAs, given that the ICAs need not be followed strictly by their owners. The Court presumes that were a hot air balloon manufacturer to place such restrictions in its ALS, which is not the case here, the balloon's owner then would be obligated to follow that language.

In this case, Defendants' ICA purportedly implied that only replacement parts approved for use by Raven/Aerostar could be used in repairing Raven/Aerostar hot air balloons.[7] As stated above, there is no requirement in the FARs that replacement envelope material be tested in accordance with the *manufacturer's* standards. In fact, before Defendants even published their ICA, the FAA already had set forth its own standards for strength and safety, 14 C.F.R. §§ 31.21–31.27, which must be met by all manufacturers and replacement parts manufacturers, including holders of STCs and PMAs. As the parties have not submitted copies of Defendants' ALS and as the parties have focused their arguments on perceptions surrounding Defendants' ICA, the Court presumes that any and all allegedly offensive, restrictive language is contained in the ICA and that there are no restrictions on third-party fabric whatsoever in Defendants' ALS.

### C. Chronology of Events

#### 1. Plaintiff's Business

Harrison Aire is a corporation which derives its income from selling hot air balloon rides to members of the general public. (Harrison Dep., Defs.' Ex. B, at 28.) In the late 1970s, Mr. Harrison purchased his first Raven-made balloon. (Harrison Dep., Pl.'s Ex. H, at 154.) In 1986, he purchased the "Big Ride" balloon from Defendants. (Actuarial–Economic Consultants Report, Pl.'s Ex. A, at 2.)[8] Since 1986, Plaintiff has had five or six conversations with Defendants' agents about the language in their ICAs restrict-

---

7. Mr. Waligunda testified that sometime before May 1982, concerned that its competitors would produce replacement envelopes for Raven balloons, Raven allegedly "made [its] manual stronger" by seemingly telling Raven owners that they had to buy Raven fabric exclusively. (Waligunda Dep., Pl.'s Ex. F, at 17–19.) Because only the manual's ICA portion was changed—a non-mandatory section—Raven knew that its customers would remain technically free to purchase third-party parts; Raven allegedly hoped, though, that the limitation would appear mandatory to the uneducated person. (*Id.* at 24.)

8. The Court cites this expert report, which is not sworn testimony but is undisputed in the record, to connect Plaintiff's retired "Big Ride" balloon to Defendants. The parties have not identified—and the Court has not located—any sworn testimony that links Plaintiff's balloon with Defendants.

ing third-party fabric, and each time Defendants responded with the same "buy our fabric" answer. (Harrison Dep., Pl.'s Ex. H, at 159–61.) In the late 1980s, having considered the venture, Mr. Harrison decided not to enter the replacement fabric business himself. (Harrison Dep., Defs.' Ex. D & Pl.'s Ex. I, at 48–49.)

Plaintiff's "Big Ride" balloon needed repairs to its envelope in 1995, which would have extended the life expectancy of the balloon another ten years. (Pl.'s Undisputed Facts, ¶ 8; Defs.' Undisputed Facts ¶ 8.) Plaintiff earlier had stockpiled sufficient amounts of Defendants' balloon fabric (purchased at 50% of cost from Raven/Aerostar distributors) for use when any of his balloon envelopes became unairworthy (Defs.' Undisputed Facts ¶ 7), but had exhausted his stockpiled resources when his "Big Ride" balloon required repairs. (*Id.* ¶ 8; Harrison Dep., Defs.' Ex. B, at 112–13.) Plaintiff claims it could not afford to purchase Defendants' fabric at this time, and instead investigated buying less-expensive third-party parts. (Harrison Dep., Defs.' Ex. C, at 35; Harrison Dep., Defs.' Ex. D, at 67.) According to Robert Waligunda, a former Raven/Aerostar distributor, Defendants' fabric was more expensive than any other fabric on the market. (Waligunda Dep., Pl.'s Ex. F, at 67.)

Plaintiff long had criticized Defendants' ICA for purportedly implying that only replacement parts approved for use by Raven/Aerostar could be used in repairing Raven/Aerostar hot air balloons. In meetings with Defendants and their representatives, Mr. Harrison frequently inquired whether this policy had changed and was repeatedly informed that Defendants' stance remained firm. Regarding Plaintiff's interaction with Raven in particular, Mr. Harrison's deposition proceeded as follows:

Q. What was your particular complaint to Raven then if you didn't believe it was misleading? What was your particular complaint?

A. The complaint was if—if the manufacturer is providing or a supplier is providing the same material to Raven, and it's available directly at half the cost to someone else, same fabric, and the same factory is saying, "We make it for Raven, and the same specs coming off the same mills, the same run, the same colors and everything. We'll provide it to you directly."

Q. Would it be—go ahead. You finish.

A. And Raven said, "No. You can't do that."

.   .   .   .   .

Q. Did you ever get any resolution of that issue that you took with Raven from Raven?

A. No.

(Harrison Dep., Pl.'s Ex. H, at 157–58.) Regarding Plaintiff's interaction with Aerostar in particular, Mr. Harrison's deposition proceeded as follows:

Q. When you received your first Aerostar manual, did it have the same type of provision regarding replacement fabric that you complained about with Raven?

A. Yes.

.   .   .   .   .

Q. Do you remember what your specific complaint to [Aerostar] was?

A. I had two or three items, maintenance items that I wanted to discuss that I was having problems with. Then when I brought those items up, I just want to see if their position was still the same on the fabric. . . . So there's probably been through the years five or six conversations that I had over other things, and at the end I always said, "By

the way, has your position on fabrics changed?"

Q. And the answer was?

A. "As long as you buy the fabric, we don't care what you do," basically. The emphasis, "buy the fabric."

Q. In any event, is it fair to say that you registered the complaint with Aerostar at its inception or shortly thereafter, within a year or two, that you did with Raven and didn't get any change

A. Correct.

Q. Okay. And that particular complaint, and correct me if I'm wrong, but the particular complaint was that the manual required you to purchase fabric from Aerostar or Raven before it and only Aerostar or Raven before it?

A. Correct.

(*Id.* at 159–62.)

In 1995, there were only three possible purveyors for fabric sales: Defendants (the manufacturer); Custom Nine Designs, run by Ronald DiGiovanni;[9] and Head Balloons;[10] these were the only lawful market options available to Harrison Aire. (Defs.' Undisputed Facts ¶¶ 9–10.) Mr. Harrison met with Mr. DiGiovanni in 1995 or 1996 to discuss purchasing replacement fabric for Plaintiff's Raven/Aerostar balloons. (*Id.* ¶ 11.) Plaintiff decided not to purchase Mr. DiGiovanni's fabric—which was "much cheaper" than Defendants' own (Waligunda Dep., Pl.'s Ex. F, at 28)— concluding that any purchase would con-

flict with the Defendants' ICA restrictions on third-party fabric, even though Plaintiff knew the FAA had certified Mr. DiGiovanni to produce and sell Raven/Aerostar fabric. (Defs.' Undisputed Facts ¶¶ 12–14; Harrison Dep., Defs.' Ex. B, at 124–28.) Mr. Harrison provided two reasons for not purchasing Mr. DiGiovanni's fabric, notwithstanding Mr. DiGiovanni's apparent FAA authorization to sell the replacement parts: One, that Mr. DiGiovanni could not confirm that his fabric was "equal to or better" than Defendants' fabric, as Mr. Harrison believed Defendants' manual required (Harrison Dep., Defs.' Ex. B, at 127); and two, that Mr. DiGiovanni was involved in a "bait and switch" ruse in which he had secured FAA approval with one product, but then switched the product with a substandard "knock off," selling the shoddy substitute to unknowing, less discerning customers (Harrison Dep., Defs.' Ex. D, at 36–37).

Without replacement fabric, Plaintiff retired the "Big Ride" balloon in 1996, never to use it again commercially (Defs.' Undisputed Facts ¶ 17), and Plaintiff seeks damages for the alleged inability to use it, due to Defendants' misconduct.

In 2001 or 2002, Plaintiff noticed that the Defendants' manual specifically allowed for third-party replacement fabric, mentioning only that STC holders (but not PMA holders) may repair Raven/Aerostar hot air balloons. (Pl.'s Undisputed Facts ¶ 35.)[11]

---

**9.** In 1994, Ron DiGiovanni started Custom Nine Designs, a competitor of Defendants authorized by the FAA to sell replacement fabric for certain balloons manufactured by Defendants. (Waligunda Dep., Pl.'s Ex. F, at 26.) The record includes excerpts of Mr. DiGiovanni's deposition.

**10.** Head Balloons joined the market in approximately 1984. (West Aff. of Nov. 2003 ¶ 13.) Head Balloons, run by Tarp Head and based in Georgia, has an STC to produce

replacement fabric. (Waligunda Dep., Pl.'s Ex. F, at 21–22.) There is no testimony in the record from Head Balloons.

**11.** According to Plaintiff's Statement of Undisputed Facts, "[Mr.] Harrison has testified that he did not realize that he was not required to use Aerostar fabric until [Mr.] DiGiovanni told him about the result in *Braden's [Balloons]*." (*Id.* ¶ 84.) *Braden's Balloons* is discussed below at Section II.C.3. However, the Court notes that Plaintiff fails to cite any

## 2. Defendants' Business

Defendants manufacture and sell hot air balloons, cold air inflatables, helium inflatables, remote control blimps, inflatable costumes and mascots, and specialty sewn products. http://www.aerostar.com. In 1981, Raven first made replacement fabric specifically for a competitor's balloon. (Waligunda Dep., Pl.'s Ex. F, at 11.) [12] In 1982, Raven introduced new language into its balloon owners' manual that required owners either to buy replacement fabric from Raven itself or to secure Raven's approval in advance if purchasing third-party fabric. (Waligunda Dep., Pl.'s Ex. F, at 18–19.) Plaintiff complained to Raven, some time before 1986, about the ICA language. (Harrison Dep., Pl.'s Ex. H, at 156–58.) Raven formed Aerostar International in 1986 for the purposes of taking over the hot air balloon aspect of Raven's business. Raven Industries has not manufactured hot air balloons since February 1986; rather, Aerostar International, as its wholly owned subsidiary, has fulfilled that role. (Compl.¶ 14.) After the inception of Aerostar, the Defendants' ICA language read as follows:

### WARNING

Only fabric which has been tested and approved according to AEROSTAR (Raven) factory standards may be used for repair of AEROSTAR (Raven) envelopes. *Failure to comply with this requirement constitutes a departure from type design and renders the balloon unairworthy.*

(Defs.' Supplemental Ex. B.) [13]

In 1993, Defendants revised the language in their ICAs. (West Aff. of Nov. 2003 ¶ 9.) In 1993, the ICA language read as follows, in pertinent part:

### 6.0 STANDARD PROCEDURES FOR REPAIR AND REPLACEMENT

.        .        .        .        .

### WARNING

**Improper repairs will render the aircraft unairworthy until repaired properly.**

\*        \*        \*        \*        \*        \*

Likewise, repair/replacement materials must be obtained from Aerostar to be considered a "certified part". In the event that repair materials are obtained, the supplying company or the repair station performing the repair must act to "certify" the material and part as equal to or better than the original equipment. [14]

.        .        .        .        .

testimonial evidence supporting this contention, and upon independently reviewing the excerpts of Mr. Harrison's depositions submitted to the Court, the Court concludes that the record does not support this assertion. Notwithstanding this discrepancy, the relevant date for purposes of this Motion, as discussed below in the "Statute of Limitations" section, is the date on which Defendants removed their allegedly restrictive ICA language and not the date on which Plaintiff actually learned about third-party fabric alternatives.

12. The parties dispute whether Raven's decision conflicted with a gentlemen's agreement among balloon manufacturers not to produce replacement parts for a competitor's product. (Pl.'s Mem. at 5; Defs.' Reply Mem. at 4; *see also* Waligunda Dep., Pl.'s Ex. F, at 13.)

13. *See supra* text accompanying note 7.

14. It appears obvious that the two sentences in this paragraph are contradictory. In 1995, the second sentence of this paragraph was changed to read, "In the event that non-Aerostar repair materials are obtained elsewhere, the supplying company or the repair station performing the repair must act to 'certify' the material and part as equal to or better than the original equipment." (West Aff. of Nov. 2003 ¶ 9 & Ex. B.) Even with the

### 6.1.2 Fabric Repair and Replacement

.    .    .    .    .

#### WARNING

**Only fabric which has been tested and approved according to AEROSTAR (Raven) factory standards may be used for repair of AEROSTAR (Raven) envelopes. Failure to comply with this requirement constitutes a departure from type design and renders the balloon unairworthy.**

\*    \*    \*    \*    \*    \*

.    .    .    .    .

#### Note

Fabric replacement is normally limited to 35% of the surface area of the envelope within a period of 100 flight hours or one year, (whichever comes first), except for additional minor patches and repairs. Deviation from this procedure up to 65% total fabric replacement may be approved after consultation with the AEROSTAR (Raven) factory. Such extensive replacement may only be undertaken if approved *in writing* by AEROSTAR (Raven). To protect the integrity of manufacturers' type designs, "100% rebuilding" of balloon envelopes is expressly prohibited according to FAR 43.13.

FOR APPROVAL TO REPLACE MORE THAN 35% OF THE ENVELOPE FABRIC, please contact:

Dee M. Rose

Aerostar International, Inc.

Customer Service

1812 "E" Avenue, PO Box 5057

Sioux Falls, SD 57117–5057

correction, these two sentences remain con-

605/331–3500    Fax 605/331–2547

(Defs.' Supplemental Ex. C.)

According to Plaintiff, Defendants again changed their ICA language in 2001, removing the language that required Defendants' permission before replacing more than 35% of the envelope fabric and the "WARNING" that failure to use fabric which has been tested and approved according to Aerostar factory standards would make the balloon unairworthy. (Pl.'s Mem. Opp'n Summ. J. at 13.)

### 3. *Braden's Balloons* and Ronald DiGiovanni

In 1996, Braden's Balloons Aloft, Inc., an FAA-approved repair station, replaced between 54% and 64% of a Raven/Aerostar balloon's envelope fabric with material from Custom Nine Designs without first obtaining Defendants' written permission. *In re Braden's Balloons Aloft, Inc.*, FAA Docket No. CP99SWO037, at *1 (July 26, 2000) (Defs.' Ex. O) [hereinafter *Braden's Balloons* ]. The FAA prosecuted Braden's in an administrative civil penalty action, on the theory that Braden's had violated various regulations by failing to follow Defendants' ICA requirement that maintenance personnel secure written permission before performing the replacement. Even though Mr. DiGiovanni, President of Custom Nine Designs, has no formal legal training, Mr. DiGiovanni represented Braden's in the administrative action.

The Administrative Law Judge dismissed the FAA's complaint, concluding that the FAA had failed to allege facts that, if proved, would have established the elements of the violations of the FARs with which Braden's had been cited. For example, the FAA complained that Braden's failed to comply with Defendants' ICA by replacing the envelope fabric with-

tradictory.

out Defendants' permission, but the FAA had failed to allege that Braden's replaced the fabric in a manner not otherwise acceptable to the FAA, a fatal pleading defect considering that procedures listed in a balloon's ICA (unlike those in the balloon's ALS) may be substituted for other FAA-accepted methods. *Braden's Balloons, supra,* at *6. In his opinion supporting dismissal, the ALJ observed:

> [T]he Complaint lists an alleged violation of FAR § 43.16. This section requires that, if one performs an inspection or maintenance specified in an Airworthiness Limitations section of a manufacturer's maintenance manual or Instructions for Continued Airworthiness, such an inspection or maintenance must conform to that Airworthiness Limitations section. Thus, unless the requirement that Braden's receive written permission for the extensive envelope repair it performed on N57199, is contained in the Airworthiness Limitations section of the maintenance manual or Instructions Continued Airworthiness promulgated by Aerostar (Raven), Braden's would not be required to comply with such a requirement.

> The Complaint does not state whether or not such a requirement is contained in the Airworthiness Limitations section of the maintenance manual or the Instructions for Continued Airworthiness. It merely states that such a requirement is a part of the Instructions for Continued Airworthiness, without making clear, one way or another, whether it is specifically located in the Airworthiness Limitations Section. The difference is important, as whether it is required or not hinges on its location. If located within the Airworthiness Limitations section, it is approved by the Administrator and a person performing an inspection or maintenance must follow its prescription. *See* 14 C.F.R. Part 31, App. A, § A31.4. However, if not located within the Airworthiness Limitations' section, the inspection and maintenance information is only accepted by the Administrator, and there is no requirement to follow the manufacturer's instructions. A deviation from those instructions will not result in a violation in § 43.16 so long as the inspection or maintenance falls under the "other methods, techniques, and practices acceptable to the Administrator" language of FAR § 43.13(a). Because the Complaint fails to specifically allege that the requirement, that Braden's consult with Aerostar (Raven) prior to performing the fabric replacement, is found in the Airworthiness Limitations section of the Aerostar (Raven) Instructions for Continued Airworthiness, this claim must also fail.

(*Braden's Balloons, supra,* at *7–8) (emphasis removed). Defendants downplay the relevance and applicability of *Braden's Balloons* to the instant case by referring to *Braden's Balloons* as an "irrelevant," "unrelated, insignificant administrative action." (Defs.' Reply Br. at 5 & n. 2.) While the Court recognizes that the ALJ dismissed the case for defects within the pleadings, it is important to note the distinction which the ALJ made between the mandatory Airworthiness Limitations Section (ALS), and the Instructions for Continued Airworthiness, which may be substituted by alternate methods, techniques, and practices acceptable to the Administrator. As explained below, this distinction is of great relevance to the claims and issues presented in this case.

Mr. DiGiovanni had taken it upon himself to inform the ballooning community of the case's result and of his interpretation of the case's precedential value, most notably through his privately maintained web-

site, http://home.earthlink.net/~aironon, which chronicles the *Braden's Balloons* saga. In a September 7, 2000 response to Mr. DiGiovanni's trumpeting, Defendants made the following representation in a letter to Raven/Aerostar owners:

> We are extremely concerned with the recent mailing which claims that the ruling in *FAA v. Bradens* "effectively nullifies the Aerostar Instructions for Continued Airworthiness manual." This is patently false and seems to suggest ignoring the Airworthiness Manual which would pose possible significant risk to balloon owners, operators and passengers. The ruling in this case was, simply, that the FAA had not met the correct technical pleading requirements in its complaint and, accordingly, the complaint was dismissed. The ruling .did not nullify the Aerostar Instructions for Continued Airworthiness manual and we urge you to follow the procedures contained in the manual as well as all applicable FAA rules and directives. We have been in contact with various offices within the FAA and have their full agreement, based on the FAR's and the requirements within the FAA Type Certificate Data Sheet that "all inspections, repairs, and replacements must be accomplished in accordance with the latest issue of Aerostar Instructions for Continued Airworthiness."

(Pl.'s Mem. Opp'n Summ. J. at 14–15, emphasis removed; also *available at* http://home.earthlink.net/~airoron/new_page_80.htm.) According to Plaintiff, Mr. Harrison has testified that he did not realize he was not required to use Aerostar fabric until Mr. DiGiovanni told him about the result in *Braden's Balloons.* (Pl.'s Undisputed Facts ¶ 84.) [15]

According to Plaintiff, Defendants changed their ICA language in 2001, re-moving the language that required Defendants' permission before replacing more than 35% of the envelope fabric and the "WARNING" that failure to use fabric which has been tested and approved according to Aerostar factory standards would make the balloon unairworthy. (*Id.* at 13.) Plaintiff suggests that Defendants undertook these revisions at the stern request of the FAA, supposedly "stung by the result in *Braden's*" and "prodded unmercifully by Custom Nine." (*Id.,* citing Michalik Dep., Pl.'s Ex. D, at 72.)

## III. Plaintiff's Allegations

Plaintiff brings four counts against Defendants (Antitrust—Monopolization; Antitrust—Tying Arrangement; Fraud; and Negligence). As stated above, Plaintiff is a corporation that derives its income from selling hot air balloon rides to the public. Plaintiff alleges that Raven Industries consciously developed and implemented several schemes to deceive balloon owners and to convince them that federal law required the exclusive use of Raven Industries fabric in the repair and replacement of hot air balloon envelopes originally purchased from Raven. (Compl. ¶ 19; *see also* Waligunda Dep., Pl.'s Ex. F, at 24–25.) Plaintiff alleges that after its incorporation, Aerostar International assumed continued responsibility for implementing and maintaining the original schemes, with the full knowledge, participation, and consent of the directors and officers of Raven, its parent corporation. (Compl. ¶ 19.) As a direct and proximate result of Defendants' behavior (to be detailed below), Plaintiff claims it could not afford to purchase replacement envelope fabric directly from Defendants for one of its hot air balloons—its "big ride" balloon—and was therefore unable to utilize that particular

15. *See supra* text accompanying note 11.

balloon commercially after 1996. (*Id.* ¶ 28.) Plaintiff apparently could have afforded to replace the envelope fabric had Plaintiff thought it was permitted to use third-party fabric, and Plaintiff contends that it would have indeed purchased the third-party fabric if the defendants had not implemented the scheme described above. (*Id.* ¶ 29.) Plaintiff claims economic losses totaling $35,000 per year (at least) from 1996 continuing through the present. (*Id.* ¶ 30; Actuarial–Economic Consultants Report, Pl.'s Ex. A.)

### A. Defendants' Alleged Schemes

In its complaint, Plaintiff describes three schemes purportedly undertaken by Defendants that constitute a violation of federal antitrust law.

### 1. Scheme One

According to Plaintiff, Raven Industries officers expressed their interest and desire in controlling the replacement fabric market at various meetings between Raven Industries and its distributors during the 1980s. At one meeting, shortly before Raven Industries created Aerostar International, Raven Industries officers allegedly advised the attendees, among whom was at least one distributor, that its maintenance manual ("Instructions for Continued Airworthiness" or "ICA") would be changed in order to control the replacement fabric market. (Compl. ¶ 20.B; *see also* Waligunda Dep., Pl.'s Ex. F, at 14–19.)

Plaintiff avers that Raven Industries deliberately inserted language into its ICA that appeared to require balloon owners either to use only Raven/Aerostar replacement fabric or to secure Raven/Aerostar approval before obtaining replacement fabric elsewhere. Plaintiff contends that at this meeting, at least one distributor in attendance raised concerns that the proposed manual language would run afoul of federal antitrust laws, and that Raven Industries officers replied that the inserted language would simply "imply" that federal regulations required the owners to use Raven replacement fabric. (Compl. ¶ 20.C; *see also* Waligunda Dep., Pl.'s Ex. F, at 23–25.) These officers allegedly told the attendees that because the inserted language appeared in the ICA (which would not require strict compliance), and not in the Airworthiness Limitations Section (which would have required strict compliance), there would be no actual antitrust violation. (*Id.*) Plaintiff claims that this scheme was implemented in 1986, ten days after the incorporation of Aerostar International.

As stated above, Section 43.13 of the FARs requires that with limited exceptions, all repairs of any type be performed consistent with the ICA. That is, according to this FAR, a hot air balloon repairman should follow the methods listed in the manufacturer's ICA or an alternative method acceptable to the FAA. 14 C.F.R. § 43.13. Furthermore, this FAR directs a hot air balloon repairman to use materials that equal or surpass the manufacturer-supplied originals in order to create a (repaired) balloon that will be at least equal to its original condition. *Id.*

The parties do not dispute that the FAA has regulated the repairs of hot air balloons. (Tr. at 18.) What the parties do dispute, and what centrally defines Plaintiff's action against Defendants, is whether Defendants acted appropriately in 1993 and 1995 (*see supra* pp. 14–16 and notes 7 & 13) by inserting language that required Raven/Aerostar balloon owners either to use Defendants' own fabric in repairs or to secure Defendants' written permission before using third-party fabric. According to Plaintiff, nothing in the FARs requires a balloon owner to use the manufacturer's

own fabric in repairs or to secure the manufacturer's written approval before using third-party fabric. (Compl.¶ 20.F.) Plaintiff criticizes Defendants' WARNING language, which specified that, under penalty of unairworthiness, Raven/Aerostar factory standards were to be applied when testing third-party fabric, especially since the FAA regulations provide separate standards for strength and safety, 14 C.F.R. §§ 31.21–31.27, which must be met by all manufacturers and replacement parts manufacturers, including holders of STCs and PMAs.

Plaintiff further contends that Defendants inserted language that appeared to require, at penalty of violation of law, that owners get specific approval from Defendants in advance before replacing more than 35% of envelope fabric, and which prohibited replacement of more than 65% of envelope fabric without the defendants' approval. (Compl.¶ 20.E.) Plaintiff alleges that Defendants had arranged the language in such a manner, and with such authority, that it reasonably appeared to balloon owners that federal law and regulations required compliance with these restrictions on envelope fabric replacement. (Id. ¶ 20.G.)

According to Plaintiff, Defendants purposely misled Mr. Harrison—and, by implication, all other Raven/Aerostar balloon owners (see, e.g., Waligunda Dep., Pl.'s Ex. F, at 25)—regarding his rights and alternatives on the matter of repairing envelope fabric for Raven/Aerostar balloons. Plaintiff contends that in practice, and in furtherance of the foregoing scheme, Defendants refused to approve any replacement that did not utilize Raven/Aerostar fabric. (Compl ¶ 20.H.) In order to reinforce its deception of fabric purchasers, Defendants allegedly contacted FAA officials and per-suaded them to initiate the administrative prosecution of a certified repairman (Braden's Balloons Aloft, Inc.), who had failed to obtain Defendants' pre-approval before replacing more than 35% of a balloon envelope's fabric. (Id. ¶ 20.I.)

### 2. Schemes Two and Three

Next, as Plaintiff contends, in order to deal with balloon owners and repairmen not fooled by the foregoing scheme, Defendants' manuals required that third-party fabric be subjected to highly-destructive "tear testing" before the fabric could be used as replacement fabric on Defendants' balloons; this fabric was later subjected to the same testing procedure annually. (Id. ¶ 20.J.) Defendants allegedly did not require their own fabric to undergo such testing until it had nearly reached the end of its useful life. (Id.) Because the test procedure required that relatively large pieces of fabric be removed for testing and then replaced, both the labor costs involved and the resulting unsightly patches in the envelope deterred owners and repairmen from using third-party fabric, and increased the probability that Aerostar International fabric would be used in the replacement process. (Id.)

Third, in order to discourage balloon owners from purchasing third-party fabric, Defendants allegedly defamed at least one third-party manufacturer (Custom Nine Designs, Inc.) by publishing an article in their newsletter reporting fabric strength tests purportedly demonstrating that Custom Nine Designs fabric was unsuitable for use in Raven/Aerostar envelopes. (Id. ¶ 20.K.) Plaintiff contends that Defendants knew their article was untrue and that Defendants refused to retract or correct the story even when its falsity was brought to their attention. (Id.) [16]

---

**16.** In either 1999 or 2000, Defendants pub-    lished their testing standards for fabric in

The parties have not developed their contentions regarding Schemes Two and Three in the summary judgment context. Plaintiff does not even explain how these acts would constitute antitrust violations. Therefore, for purposes of this Memorandum, the Court mentions these schemes in the interest of describing Plaintiff's allegations in the entirety, but will focus predominantly on Scheme One, finding that the parties have largely ignored Schemes Two and Three.

### B. Plaintiff's Counts Against Defendants

#### 1. Count One: Antitrust—Monopolization

Plaintiff asserts that Defendants possessed monopoly power in the Raven/Aerostar hot air balloon replacement fabric market in the United States. (Compl.¶ 32.) In the alternative, even if Defendants had not actually possessed monopoly power in the relevant market, their acts were intended as an attempt to monopolize the Raven/Aerostar envelope replacement fabric market. (Id. ¶ 34.) Defendants' alleged acts supposedly constituted impermissible exclusionary practices under Section 2 of the Sherman Act, practices which were designed by Defendants to strengthen and to perpetuate their monopoly position. According to Plaintiff, Defendants' acts directly and proximately restrained trade, and directly and proximately caused Plaintiff's damages.

their manual. (West Dep., Pl.'s Ex. G, at 131.) Defendants started subjecting competitors' fabric along with their own to these newly announced testing standards, and published the results in a newsletter mailed to Raven/Aerostar owners in either 1999 or 2000. (Id.) A typo in the newsletter misrepresented the results for fabric produced by Ron

#### 2. Count Two: Antitrust—Tying Arrangement

According to Plaintiff, Defendants possessed monopoly power in the market for the tying product (i.e., hot air balloons) and used this monopoly power to restrain trade in the tied product (i.e., replacement fabric for balloon envelopes). (Compl.¶ 38.) This alleged tying arrangement supposedly substantially affected—and continues to affect—interstate commerce. (Id. ¶ 39.) Defendants' acts, as alleged, directly and proximately restrained trade, and directly and proximately caused Plaintiff's damages. (Id. ¶¶ 40, 42.)

#### 3. Count Three: Fraud

Defendants allegedly intended that Plaintiff and all other Aerostar International balloon owners rely upon these supposed misrepresentations. (Compl.¶ 44.) Plaintiff contends that it justifiably relied upon these misrepresentations, and that its damages were a direct and proximate result of its justifiable reliance upon the misrepresentations. (Id. ¶¶ 45–46.) Additionally, as represented by Plaintiff, Defendants' conduct was outrageous and warrants the imposition of punitive damages. (Id. ¶ 47.)

#### 4. Count Four: Negligence

Plaintiff alleges that Defendants' conduct was negligent and that its damages were a direct and proximate result of said negligence. (Compl.¶¶ 49–50.)

DiGiovanni and Custom Nine Designs and indicated that that fabric is unsafe for use with Raven/Aerostar balloons. Defendants claims they corrected any error by subsequently mailing a correction letter to the same mailing list three months later. (West Aff. of Jan. 2004 ¶ 5.)

## IV. Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

Defendants move for summary judgment on three grounds. One: Defendants contend that Plaintiff's antitrust claim is barred by the four-year statute of limitations applicable to antitrust claims. Two: Defendants claim that summary judgment is warranted upon application of implied immunity to Plaintiff's antitrust claims. Three: Defendants argue that Plaintiff cannot succeed in proving the requisite elements for its antitrust, fraud, or negligence claims, thus justifying summary judgment against Plaintiff. The Court will discuss these arguments *seriatim.*

### A. First Argument: Statute of Limitations

#### 1. Parties' Contentions

A plaintiff's claim is viable under the federal antitrust provisions only if suit is "commenced within four years after the cause of action accrued," 15 U.S.C. § 15(b), plus any additional number of years during which the statute of limitations is tolled. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. *Id.* According to Defendants, the four-year limitations period commenced in 1996 when Plaintiff's "big ride" balloon was no longer in service and its commercial losses began to accrue.

Defendants note that Plaintiff did not file its complaint until March 2002, almost six years beyond the time Plaintiff claims to have first suffered a loss. Moreover, Defendants contend that Plaintiff's actual

knowledge about the source of any losses—i.e., the "restrictive" manual—well predated the retirement of the big ride balloon. Defendants state that Mr. Harrison repeatedly expressed his complaints about the Raven/Aerostar language in the 1970s, 1980s, and 1990s, and contend that Mr. Harrison should not now be heard regarding damages that would have begun accruing in 1995 and 1996. Further, Defendants argue that given his 1995–1996 visit with its competitor for replacement fabric, Custom Nine Designs, Inc. and Mr. Harrison's general familiarity with the FARs, Plaintiff clearly knew or should have known its legal avenues for fabric replacement as set forth within the FARs.

Defendants emphasize that Mr. Harrison testified that in the late 1980s, he contemplated going into business as a manufacturer of replacement fabric, but did not do so, at least in part due to the allegedly restrictive language within Defendants' ICA. Mr. Harrison opted not to pursue that venture believing that he could not effectively compete with Defendants for business. (Harrison Dep., Defs.' Ex. D & Pl.'s Ex. I, at 48–49.) With Mr. Harrison's longstanding knowledge of Defendants' stance on replacement fabric, Defendants contend that Plaintiff's Complaint—filed more than six years after the retirement of the big ride balloon and decades after his complaints and aborted enterprise—must be dismissed as untimely. Moreover, Mr. Harrison conceded that certain language in Aerostar's ICA indicates that balloon owners could purchase replacement fabric from third-party sources provided that the third-party held an STC or a PMA,[17] and Mr. Harrison testified that such language would imply that third-party fabric, if so certified, was acceptable. (Harrison Dep., Defs.' Ex. B & Pl.'s Ex. H, at 164–65.) While Mr. Harrison stated that he did not first notice this language until 2003, Defendants argue that such language had been printed in their ICA as early as 1993, thus placing Mr. Harrison on constructive notice since that time. Defendants conclude that Mr. Harrison had everything necessary to pursue his claim in 1996.

Plaintiff alleges that Defendants engaged in fraudulent misrepresentation; to succeed on this claim, Plaintiff must demonstrate that Defendants fraudulently concealed their own unlawful activities and that Plaintiff did not discover these facts despite the exercise of due diligence. *E.g., In re Linerboard Antitrust Litig.,* 203 F.R.D. 197 (E.D.Pa.2001). Plaintiff claims that equitable tolling applies and would have extended Plaintiff's deadline for suit past its original date. Defendants disagree, arguing that Plaintiff's pre-existing knowledge of the allegedly wrongful conduct defeats its attempt to establish equitable tolling. Defendants also emphasize that Plaintiff failed to exercise any form of due diligence to pursue the alleged wrong. Plaintiff supposedly did nothing between 1996 and 2002 to pursue its legal remedies following the loss of use of his "big ride" balloon and his alleged inability to have it repaired, notwithstanding his longstanding complaints about the manufacturers' language, notwithstanding changes in the Aerostar ICA which alerted the owner to the validity of other replacements, and notwithstanding Mr. Harrison's knowledge of, and access to, the federal regulations that govern this field. Defendants claim there

---

17. As explained above at pages 7–8, a hot air balloon envelope can only be repaired with FAA approved replacement parts (fabric falls under the category of "parts") from either: (a) the manufacturer of the product; (b) the holder of a Supplemental Type Certificate ("STC"); or (c) an entity with Parts Manufacturing Approval ("PMA"). 14 C.F.R. § 21.303.

were no efforts to seek redress with calls to the manufacturer, no calls to the FAA, no independent research, no calls for any form of legal representation or advice. Defendants also argue that Plaintiff cannot display any active conduct by the Defendants which would reveal fraudulent concealment or an intention to mislead. Defendants contend that Plaintiff cannot cite one conversation with the defendants, one passage of deposition testimony, one document, or any other evidence that bespeaks fraudulent intentions.

### 2. Analysis

Generally, a cause of action accrues—and the statute of limitations begins to run—when a defendant commits an act that injures a plaintiff. In the context of a continuing antitrust violation, each time a plaintiff is injured by the act of the defendant, a cause of action accrues to the plaintiff to recover damages caused by that act.

However, a suit may be brought more than four years after the events that initially created the cause of action if the defendant commits "an act that by its very nature constitutes a 'continuing antitrust violation.'" *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 n. 2, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). An act constitutes a "continuing antitrust violation" if it injures the plaintiff over a period of time. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n. 5, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Antitrust law provides that in the case of a continuing antitrust violation each overt act that is part of the violation and that injures the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997);

*see also Hanover Shoe*, 392 U.S. at 502, 88 S.Ct. 2224.

*In re Linerboard Antitrust Litig.*, MDL No. 1261, 2000 WL 1475559, at *4, 2000 U.S. Dist. LEXIS 14433, at *16–17 (E.D.Pa. Oct. 5, 2000).

[A] new cause of action may arise from later overt acts in furtherance of a challenged conspiracy or from each injury resulting from a continuing violation. However, to trigger a new cycle of the limitations period, the overt act must specifically affect the plaintiff and not be merely a continuation of the conspiracy. If the plaintiff suffered injury at the beginning of the continuing conspiracy but not thereafter, the plaintiff may not enjoy the benefits of an extended limitations period.

ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 893–94 (5th ed.2002) (footnotes omitted) [hereinafter ABA ANTITRUST].

■■■ Defendants thoroughly chronicle Plaintiff's actions since the 1970s that potentially indicate Plaintiff's longstanding awareness of any allegedly offensive behavior, and Defendants essentially argue that Plaintiff's claim should not be considered timely considering its decades-old knowledge of the offending behavior and overall inactivity until only recently. (Harrison Dep., Defs.' Ex. B & Pl.'s Ex. H, at 150–54, 156–58, 159–62; Harrison Dep., Defs.' Ex. D & Pl.'s Ex. I, at 43–44, 46, 47–48.) Defendants claim that in 1993, their ICA first alerted balloon owners that they could purchase third-party replacement fabric instead of directly from Raven/Aerostar. Therefore, even though Mr. Harrison testified that he had not read this language until 2003, Defendants argue that Plaintiff had been on notice of its expanded alternatives for nearly ten years before filing this suit. In 1993, a portion of the relevant ICA language read, "[R]epair/re-

placement materials must be obtained from Aerostar to be considered a 'certified part'. In the event that repair materials are obtained, the supplying company or the repair station performing the repair must act to 'certify' the material and part as equal to or better than the original equipment." (Defs.' Supplemental Ex. C.) The Court cannot conclude that this language necessarily placed Raven/Aerostar balloon owners on notice that they could purchase third-party replacement fabric, given that the first and second sentences appear to contradict each other. As Defendants point out, balloon owners are notified that third-party fabric must be certified before use, thus indicating that third-party fabric is acceptable material; however, the preceding sentence states that only materials supplied by Defendants are considered certified. Given that the Court must give the benefit of the doubt to Plaintiff, as the non-moving party, the Court cannot conclude as a matter of law that this language placed Plaintiff and other Raven/Aerostar balloon owners on notice regarding their ability to purchase third-party fabric.

Here, Plaintiff has presented facts that Defendants' predatory acts continued unabated through 2001, at which time Defendants changed the ICA language. According to Plaintiff, it has been harmed by Defendants' antitrust activity continuously until the ICA change, because the company has lost income which it otherwise would have earned had Plaintiff repaired its most profitable balloon.[18] It is undisputed between the parties that the written change allegedly removing the language offensive to Plaintiff occurred in 2001. Given that Plaintiff filed the instant suit less than four years following Defendants'

rewriting of the ICA, there is an issue of fact for trial as to whether the applicable statute of limitations had expired.

In light of case law such as *Linerboard* and *Klehr, supra*, which held that, in the context of a continuing antitrust violation, each overt act starts the statutory period running again "regardless of the plaintiff's knowledge of the alleged illegality at much earlier times," *Linerboard,* 2000 WL 1475559, at *4, 2000 U.S. Dist. LEXIS 14433, at *17, even though Plaintiff might have realized that it suffered injury each year, assuming Plaintiff filed this case within four years of its last alleged injury, its case is timely and the statute of limitations will not bar these claims from continuing. The Court cannot resolve this issue as a matter of law at this time. Thus, summary judgment will be denied on these grounds.

## B. Second Argument: Implied Immunity

### 1. Parties' Contentions

The doctrine of implied immunity arises where an alleged violator of the law has acted pursuant to congressional or regulatory authority that conflicts with conduct alleged to be in violation of the antitrust laws. *See generally* ABA ANTI-TRUST, *supra*, at 1238–40. Because the hot air balloon industry is heavily regulated, Defendants argue that their actions and activities undertaken pursuant to congressional or regulatory authority should be entitled to implied immunity from the federal antitrust laws. Defendants assert they developed their ICAs jointly with the FAA, as they were obligated to do by operation of FAA guide-

18. Had Plaintiff repaired its "big ride" balloon, the balloon would have remained aloft and commercially viable until 2006, its next anticipated repair date. Plaintiff has submitted an expert report that details the company's economic losses following the retirement of its "big ride" balloon. (Actuarial–Economic Consultants Report, Pl.'s Ex. A.)

lines, and each successive year after this initial acceptance by the FAA, the ICA remained subject to FAA oversight.

In developing and maintaining their ICAs pursuant to the direct obligation imposed by the FAA, and having worked both with and under the direction of the FAA in creating their ICAs, Defendants contend that they cannot now be held liable in antitrust. At a minimum, Defendants claim they had a reasonable belief that their actions vis-à-vis Plaintiff were appropriate if not necessary in complying with regulatory and administrative mandates, confirmed by the FAA itself. According to Defendants, to hold them accountable in antitrust would subject them to severe liability for conduct they took in order to ensure aviation safety for hot air ballooning.

### 2. Analysis

This case features the friction that occasionally arises when Congress establishes a regulatory regime which appears inconsistent with the vigorous competition also mandated by Congressional statutes. An express exemption to antitrust liability exists wherever Congress explicitly states that the antitrust laws will not apply to the conduct authorized by the legislation, either in general, or under the specific circumstances enumerated in the legislation. *See generally* ABA ANTITRUST, *supra*, at 1238. By contrast, where a Congressional statute mandates certain behavior, but omits to exempt the behavior expressly from the purview of the antitrust laws, an exemption might need to be implied in order to preserve Congress's regulatory intentions. *Id.* In this case, where the relevant statutes contain no express exemption, Defendants argue that this Court should find that the regulations that mandated their conduct, now challenged by Plaintiff contain an implied exemption that would insulate Defendants' behavior from antitrust liability.

Defendants have a heavy burden to prove an implied immunity. "Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 719, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975); *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 348, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Implied antitrust immunity is restricted only to the activity challenged, and will not extend to conduct otherwise overseen by the regulatory agency. *See generally* ABA ANTITRUST, *supra*, at 1238. In conformance with these principles, while the Supreme Court has recognized implied immunity from certain prosecutions under the antitrust laws, the Court has steadfastly held that the Federal Aviation Act does not completely displace the antitrust laws. *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 387, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296, 305, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).

■ Whether Defendants are entitled to implied antitrust immunity because they developed, drafted, and promulgated their ICAs in conjunction with the FAA appears to be a matter of first impression. Only where Congress has invested pervasive supervisory authority in a regulatory agency should a court conclude that Congress intended to ease liability under the Sherman Act. *See, e.g., Nat'l Ass'n, supra.* The Court concludes that Defendants have not established a sufficiently coherent and pervasive theory of regulation, nor do they document any congressional intent that companies in the balloon industry are immune from antitrust litigation by virtue of

collaboration with the FAA in drafting and promulgating their ICAs.

### a. Federal Regulations Applicable to Hot Air Ballooning

As discussed above in Section II.B, there are numerous federal regulations that apply *inter alia* to the manufacture and sale of both hot air balloons and replacement parts. To summarize, balloon manufacturers are required to distribute to their customers ICAs, which are model-specific maintenance manuals that detail standards and procedures to be used during maintenance, alteration, or preventive maintenance of the aircraft. These methods or practices generally may be substituted by other maintenance methods or practices acceptable to the FAA. The ICA might contain a segregated section of additional techniques, known as the ALS, from which maintenance personnel may not deviate. Replacement parts may be manufactured and sold by the aircraft's original manufacturer or by a third-party that holds either an STC or PMA, documents which indicate that the FAA has approved the third-party's product. However, these regulations did *not* require the conduct which Plaintiff contends violated the antitrust laws: for example, no federal regulation requires that a hot air balloon owner first secure the original manufacturer's permission to use third-party fabric before repairing the balloon envelope.

It appears clear from the record that although Defendants' ICA implied that only Defendants-approved replacement parts could be used, there is no requirement in the FARs that replacement envelope material be tested in accordance with the *manufacturer's* standards. In fact, the FAA has set forth its own standards for strength and safety, 14 C.F.R. §§ 31.21–31.27, which must be met by all manufacturers and replacement parts

manufacturers, including holders of STCs and PMAs. Thus the Court concludes that both Plaintiff and Defendants have overstated the case. The regulations do not require the defendants to do what they did, and what Plaintiff claims is unlawful under the antitrust laws. Nonetheless, the Court will review the applicable case law.

### b. Relevant Case Law

The starting point in the case law on implied immunity are two Supreme Court opinions that hold that implied immunity from the antitrust laws is to be sparingly inferred from the enactment of a regulatory statute: *Pan American World Airways v. United States, supra,* and *Hughes Tool Co. v. Trans World Airlines, supra.* The Court notes that neither *Pan American* nor *Hughes Tool Co.* give Defendants any specific support regarding ICAs and implied immunity.

In *Pan American, supra,* the United States brought a civil antitrust action against Pan American World Airways, W.R. Grace & Company, and their jointly-owned subsidiary, Pan American–Grace Airways ("Panagra"). When Pan American and Grace organized Panagra, the companies agreed that Panagra and Pan American would not parallel each other's air routes, a combination and conspiracy allegedly in restraint of trade and monopolization and attempted monopolization of air transportation between the United States and South America. The United States further alleged that Pan American had used its control over Panagra to prevent it from obtaining authority from the Civil Aeronautics Board to extend its route from the Canal Zone to the United States. The district court dismissed the case against Grace and Panagra, finding that none of their practices violated the Sherman Act. Regarding Pan American, however-er, the lower court concluded that by sup-

pressing Panagra's efforts to extend its route from the Canal Zone to the United States, Pan American had violated the Sherman Act, and ordered Pan American to divest itself of its stock in Panagra.

On direct appeal to the Supreme Court, the Court held that the issues presented had been congressionally entrusted to the Civil Aeronautics Board for resolution, and dismissed the complaint in its entirety. Finding that the limitation of routes and divisions of territories, and the relation of common carriers to air carriers, were fundamental to the regulatory scheme developed by Congress, the Court held that the antitrust violations charged in the complaint had been reserved for the Board's authority "in granting, qualifying, or denying certificates to air carriers, in modifying, suspending, or revoking them, and in allowing or disallowing affiliations between common carriers and air carriers." *Pan American*, 371 U.S. at 305, 83 S.Ct. 476. While the Court accordingly ordered the dismissal of all claims against all defendants, the Court was careful to stress the narrowness of its holding; that is, the Federal Aviation Act does not completely displace the antitrust laws, but only those segments necessarily implicated by the particular regulatory scheme enacted by Congress. The Court held, "While the Board is empowered to deal with numerous aspects of what are normally thought of as antitrust problems, those expressly entrusted to it encompass only a fraction of the total." *Id.*

In *Hughes Tool Co., supra,* Trans World Airlines ("TWA") brought an antitrust action against Hughes Tool Company ("Toolco") that challenged Toolco's ability, in exercise of its controlling interest in TWA, to control and dictate how TWA acquired and financed aircraft. Toolco had defended itself claiming that its challenged transactions were under the control and surveil-

lance of the Civil Aeronautics Board ("CAB") and subsequently immune from the antitrust laws by virtue of the Federal Aviation Act of 1958. The district court had entered a default judgment against Toolco, which the Second Circuit Court of Appeals upheld. The Second Circuit had distinguished *Pan American*, concluding that the continuing supervision of the CAB over the Toolco–TWA relationship was general and not related to any specific conduct that would have constituted an antitrust violation. *Hughes Tool Co.,* 409 U.S. at 378, 93 S.Ct. 647. The Supreme Court disagreed and found *Pan American* applicable to the case, especially in consideration of the relevant statute and the several opinions and orders issued by the CAB regarding the Toolco–TWA relationship.

> [F]rom 1944 through 1960 every acquisition or lease of aircraft by TWA from Toolco and each financing of TWA by Toolco required Board approval. Each transaction was approved by the Board and each approval was an order under § 408, for the Board regarded its transactional orders as modifications or interpretations of its antecedent control order. Each of the modification orders recited a finding of the Board that the transactions were "just and reasonable and in the public interest."

409 U.S. at 379, 93 S.Ct. 647. Toolco was forbidden from acquiring control of TWA without CAB approval; under the Federal Aviation Act, the CAB only could have approved the acquisition if it were found consistent with the public interest, *id.* at 381, 93 S.Ct. 647, and the CAB could not have approved Toolco's actions had there been the possibility of a resultant monopoly which could have restrained competition or jeopardized another air carrier. *Id.* at 384, 93 S.Ct. 647. As in *Pan American*, the Court in *Hughes Tool Co.* emphasized the narrowness of its holding, namely that

while the defendant was entitled to antitrust immunity in this case, the Federal Aviation Act overall does not completely displace the antitrust laws. *Id.* at 389, 93 S.Ct. 647.

According to Defendants, *Scroggins v. Air Cargo, Inc.*, 534 F.2d 1124 (5th Cir. 1976), supports their argument for implied immunity in this case,[19] that Plaintiff's action should be dismissed considering the FAA's participation in the initial drafting of the challenged ICA's and its continued involvement throughout Defendants' revisions thereof. In *Scroggins*, several airlines contractually created a jointly-owned transportation arrangement agency, which was entrusted with such powers as the ability to negotiate contracts with third parties for the pick-up and delivery of air cargo. 534 F.2d at ·1126–27. The Civil Aeronautics Act of 1938 required the airlines to submit these contracts for the approval of the CAB. *Id.* at 1127. The Board expressly found that the agreement was not contrary to the public interest, but also announced an intention to reexamine the arrangement if future circumstances so required. *Id.* Plaintiff was the trustee in bankruptcy for a trucking company which had requested an increase in the rates under its contract with the agency; the agency responded by diverting its business to another trucking company.

The court in *Scroggins* held that the defendant's conduct was immunized from antitrust liability because "(a) the actions complained of were within the contemplation of prior CAB orders which specifically considered effects upon future competition and (b) the CAB has retained an active supervisory jurisdiction to correct anticompetitive developments as they arise."

534 F.2d at 1132. Concerning the involvement of the regulatory agency in the formulation and oversight of the air cargo contracts, the court in *Scroggins* found it persuasive that the CAB continued to subject contractual amendments to scrutiny in order to determine whether the amendments furthered the public interest. The CAB had been exercising continuing jurisdiction over the affected area of operations, and only approved the revised contracts when found not to be adverse to the public. *Id.* at 1131–32. The court wrote, "The CAB has continued to scrutinize every amendment to the contract which defines ACI's rights and duties, and has approved the revise[d] contracts only when found not to be adverse to the public interest.... The Board also announced that it would reconsider its approval if the future development of ACT should so warrant." *Id.* at 1132.

**c. Implied Immunity Does Not Apply in This Case**

The Court concludes as a matter of law that Defendants are not entitled either to express or to implied immunity from antitrust prosecution. Defendants contend that they could not have promulgated their ICAs had the FAA not first participated in the drafting and revision of the language and then later approved the language. Defendants suggest that because they have acted in obedience to a regulatory authority, they are impliedly immune from Plaintiff's subsequent charges that their conduct violated the antitrust laws.

█ The Court rejects Defendants' contentions for two reasons. First, as noted above, Defendants have overstated the thrust of the FAA regulations. Second,

**19.** Regarding Defendants' implied immunity defense, the parties have not cited any Third Circuit precedent, as the Third Circuit has apparently not yet addressed under what circumstances in the aviation context a defendant would be entitled to implied immunity from the federal antitrust laws.

Defendants' argument that those industry actors who adhere to a regulatory agency's regulations are thereafter insulated from antitrust liability is incorrect in its breadth. Even if Defendants' theory were generally correct, Supreme Court precedent firmly establishes that the Federal Aviation Act, which created the regulatory agency at issue in this case, does not completely displace the antitrust laws. *Pan American*, 371 U.S. at 305, 83 S.Ct. 476; *Hughes Tool Co.*, 409 U.S. at 389, 93 S.Ct. 647. The major theme of those cases is that immunity is implied only where the challenged conduct is subject to a regulatory scheme that expressly directs the agency to consider antitrust policies in the context of the regulated industry. There is no evidence to this effect in this case.

■ Defendants correctly contend that the overriding federal interest in aviation safety compels them to adhere to the guidelines and requirements of the regulatory body. But compliance with safety regulations does not lead to antitrust immunity from the antitrust laws. Defendants' overstatement is argued in their reply brief,

> When companies stray from the mandates and requirements of governmental regulation, people get hurt, people even die. One need go no further than a daily newspaper to recognized [sic] this fact, with commonplace examples such as polluters bypassing regulation by discharging harmful agents into the environment and businesses violating fire codes. So too with the aviation industry.

(Defs.' Reply Br. at 9.) While this Court certainly cannot question the importance of compliance with federal regulations where aviation safety is concerned, the Court notes that Defendants' argument does not support its implied immunity claims. That is, Defendants would have

this Court find them impliedly immune from antitrust litigation because the FAA concluded that Defendants' manual—written collaboratively by Defendants and the FAA—would be effective in promoting and guaranteeing hot air balloon safety. The disconnect is obvious.

What Defendants neglect to show, with any evidence, is that the FAA, in collaborating with Defendants, specifically considered the potential alleged anticompetitive consequences of the ICA and nonetheless approved or accepted the language. Defendants have only presented evidence that the primary concern of the FAA was aviation safety, which this Court obviously should not question or second-guess. In a December 1998 letter to Mr. DiGiovanni, submitted to the Court by Defendants, Ava L. Mims of the FAA stated, "*It is not the responsibility* of the FAA to monitor antitrust issues, which are a matter for the civil courts." (Defs.' Ex. K.) Mark West, President of Aerostar International, Inc., stressed that the Defendants and the FAA were cooperating with aviation safety (and not the anticompetitive consequence) as their chief consideration, stating that:

> The overall goal of both Raven and the FAA was to promote aviation safety through language which instructed the aircraft owner as to how and when the aircraft would no longer be airworthy, i.e., when and how repairs were required so that the aircraft could be legally, and safely, flown.

(West Aff. of Nov. 2003 ¶ 7; *see also id.* ¶¶ 4, 8.) Demonstrating further that the Defendants and the FAA were primarily concerned with fostering and ensuring aviation safety, Mr. West also stated, "The language of the ICA was not the product of any effort by defendants to limit or restrict the market, rather, it was a function of Raven and Aerostar's compliance with the Federal laws and the Federal

Agency empowered to enforce those laws in the interest of aviation safety." (*Id.* ¶ 11.) That the FAA had not considered the anticompetitive consequences of Defendants' ICA is no surprise, especially upon consideration that nothing in the ICA outright forbids the use of third-party replacement fabric.

However, under *Pan American* and *Hughes Tool Co.*, it is clear that a defendant wishing to invoke implied antitrust immunity must demonstrate that the regulatory agency was authorized by Congress to consider the anticompetitive implications of its actions and enact regulations that essentially "trumped" the antitrust laws. Under those circumstances, Congress intended the regulatory scheme to operate as a more refined, but functionally equivalent, substitute for the standard antitrust regime, and that to penalize the challenged conduct would be an invasion of the regulatory agency's competence. The Court in *Pan American, supra,* concluded that the plaintiff's complaint should have been dismissed because the relevant statute explicitly gave the regulatory agency broad power to investigate and halt unfair practices and unfair methods of complaint—including those alleged in the complaint—and because if the courts later were to intrude, imposing their own interpretation of the antitrust laws, the two regimes potentially would collide. Similarly in *Hughes Tool Co., supra,* the Court concluded that the defense of implied immunity was applicable because the regulatory agency, pursuant to statutes that empowered it to permit only those acquisitions of control that were not inconsistent with the public interest and that would not have resulted in a monopoly, had considered the anticompetitive consequences of the defendant's every acquisition and lease of aircraft. Along these lines, the court in *Scrog-*

*gins, supra,* held that the defendant's conduct was immunized from antitrust liability because "(a) the actions complained of were within the contemplation of prior CAB orders which specifically considered effects upon future competition and (b) the CAB has retained an active supervisory jurisdiction to correct anti-competitive developments as they arise." 534 F.2d at 1132.

#### d. The Evidence in This Case Does Not Show FAA Consideration of Anticompetitive Consequences

The deposition testimony in evidence shows that the FAA reviewed Defendants' ICAs in order to promote and preserve aviation safety. There is nothing in the record demonstrating that the FAA considered the antitrust laws and weighed the anticompetitive effects, if any, of its approval of Defendants' ICA language. Gregory Michalik is the FAA Senior Aerospace Engineer and Program Manager in charge of FAA oversight for the Aerostar program on behalf of the FAA, and it is on his testimony Defendants rely for their contention that the relationship between Defendants and the FAA is a formal, collaborative process to ensure aviation safety from which Defendants may not deviate. The Court finds that Mr. Michalik's testimony demonstrates the overarching safety concern in drafting the ICAs. When asked whether he knew the purpose of the particular provision that required approval to replace up to the maximum 65 percent of the hot air balloon envelope, Mr. Michalik testified, "My understanding is to maintain the structural integrity of the envelope and so it would be a safe vehicle to fly." (Michalik Dep., Defs.' Ex. G, at 38; *see also id.* at 42–43.) Mr. Michalik's deposition proceeded as follows in pertinent part:

[Defense Counsel]: What were you conveying to Mr. DiGiovanni in [a letter

addressed to him], what were you telling him?

[Mr. Michalik]: It was that if you need to replace more than 35 percent of your fabric that a request should be sent to Aerostar. Aerostar will then evaluate the request, see where the damage is, help them with putting together a repair, and provide them with the necessary instructions and documents in order to complete that repair.

Q: Is the reason for that because that's what the ICA said?

A: Yes.

Q: And on behalf of the FAA you were making it your position that the ICA's instructions were to be followed by the balloon owner, correct?

A: Yes.

Q: What would be the underlying purpose of that instruction?

A: To insure that the repaired balloon would be in a safe condition for flight. (*Id.* at 55–56.) Mr. Michalik stated that in drafting the ICA language alongside Defendants, the predominant consideration of the parties was aviation safety (*see, e.g., id.* at 46), and nowhere does Mr. Michalik even hint that the FAA contemplated the anticompetitive consequences of its collaboration with Defendants. In addition to Mr. Michalik, Michael Gallagher and William Timberlake—FAA Small Plane Directorate Manager and FAA Manager, respectively—also testified that FAA acceptance of ICA language is a formal, *safety-driven* process undertaken by all manufacturers before they can place their aircraft and parts on the market. (Gallagher Dep., Defs.' Ex. I, at 32; Timberlake Dep., Defs.' Ex. J, at 82–83.)

Defendants have not argued that the FAA considered the anticompetitive ramifications of its approval or acceptance of their ICA language, nor does the evi-

dence of record support this Court independently finding as a matter of law that the FAA had actually contemplated and condoned, as was its administrative prerogative, the effects of its imprimatur on competition within the hot air balloon industry. Instead, in their papers and arguments submitted to the Court, Defendants consistently have contended that the FAA approved or accepted their manuals in the interest of aviation safety, and not in the interests of promoting competition within the industry. Defendants argued that "[a]t all times, the defendants operated within the strictures of a statutory scheme developed and maintained by the FAA *for the primary purpose of ensuring air safety.*" (Defs.' Mem. Supp. Mot. Summ. J. at 31) (emphasis added).

As Defendants stated in their reply brief, "each FAA representative has testified that these considerations are grounded in *safety* considerations, the FAA's primary charge to the public, implemented by regulating manufacturers in the market ...." (Defs.' Reply Br. at 9) (emphasis added).

The Court cannot conclude as a matter of law that exposing Defendants to antitrust liability stemming from a challenged safety manual written in collaboration with a regulatory agency would interpose a second, potentially adverse construction of the antitrust laws, as proscribed by *Pan American* and *Hughes Tool Co.*, where the regulatory agency at issue is not demonstrated to have authorized (or ever considered) the possible anticompetitive consequences, nor even alleged to have such regulatory power. "Antitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct." *Phonetele, Inc. v. AT & T Co.*, 664 F.2d 716, 729 (9th Cir.1981).

The Court concludes that Defendants have not satisfied their burden to succeed on this argument of their motion for summary judgment.

### C. Third Argument: Whether Plaintiff Has Presented Sufficient Facts to Prove a *Prima Facie* Case

#### 1. § 2 Monopoly Claim

##### a. Parties' Contentions

Count I of Plaintiff's complaint charges monopolization and attempted monopolization, and alleges that the relevant product market is "the Raven/Aerostar balloon replacement fabric market in the U.S." (Compl.¶ 32.) Defendants argue again, as an alternative to immunity, not only that Plaintiff cannot demonstrate that their conduct was anticompetitive, (because their actions in formulating and maintaining their ICAs were taken while acting pursuant to a regulatory system that obligated them to take the very actions at issue in this case), but also, that Plaintiff can display nothing other than a highly subjective, personal opinion that the defendants' conduct was anticompetitive. According to Defendants, all the objective evidence—as derived from other parties, from the ICAs and FARs, and from the FAA itself, through the testimony of Mr. Mickalik—indicates that Defendants were acting under the auspices of the FAA and the FARs, and solely in the interest of promulgating air safety for hot air balloonists within the confines of a regulatory system.

Defendants also argue that the evidence of record does not indicate any anticompetitive activity by them. According to Defendants, the evidence reveals that even if they are not immune, the market for replacement fabric is a function of the extreme regulatory measures placed upon any person or entity wishing to participate in the market. As Defendants emphasize, until the mid–1980s, Raven/Aerostar was the only participant in this market and has only since been joined by two other companies able to secure regulatory preapproval. (West Aff. of Nov. 2003 ¶ 13.) Defendants argue that their standing in the market is not a function of anticompetitive activity, but of natural market forces within a highly regulated industry. (*Id.*)

##### b. Analysis

■ Plaintiff acknowledges that Defendants' early prominence in the market largely was due to FAA regulations and prerequisites no other company had satisfied. (Pl.'s Mem. at 32.) Plaintiff argues that after attaining such status, Defendants took full advantage of its monopoly position to discourage any competition by implying through its ICAs, as discussed above, that use of any other company's fabric would render the balloons "unairworthy". Defendants allegedly placed further restrictions upon how much fabric could be replaced without first obtaining its permission to make the repair, and informed all owners and repairmen that these restrictions were "expressly" authorized by law.[20]

---

**20.** The most notable example of this behavior was the September 7, 2000 letter Defendants mailed to their hot air balloon customers in the wake of the *Braden's Balloons* litigation, in which Defendants wrote, in pertinent part:

We have been in contact with various offices within the FAA and have their full agreement, based on the FAR's and the requirements within the FAA Type Certificate Data Sheet that "all inspections, repairs, and replacements must be accomplished in accordance with the latest issue of Aerostar Instructions for Continued Airworthiness."

(Pl.'s Mem. Opp'n Summ. J. at 15, emphasis removed; *see also supra* p. 198.)

The Court requested both parties to submit supplemental briefs on the leading Supreme Court decision on the interplay between the antitrust laws and replacement products, *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). In this case, the district court had granted summary judgment for Kodak on allegations that Kodak unlawfully monopolized and attempted to monopolize the sale of service and parts for copy and micrographic equipment manufactured by Kodak and had also engaged in an alleged tying arrangement. The plaintiffs were independent service organizations (ISO's) which asserted that Kodak's policies to limit the availability of replacement parts for its equipment to ISO's, and to make it more difficult for ISO's to compete with Kodak in servicing such equipment, violated the antitrust laws. The Ninth Circuit had reversed the summary judgment for Kodak and the Supreme Court affirmed.

The Court will follow the order established by Plaintiff's Complaint and first consider Plaintiff's claims under Section 2. The Supreme Court has defined monopoly as follows:

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*Kodak*, 504 U.S. at 481, 112 S.Ct. 2072 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).[21]

In *Kodak*, the Supreme Court, in an opinion by Justice Blackmun, rejected Kodak's contention that as a matter of law, there could not be a separate product market for the replacement parts of one manufacturer. In *Kodak*, the Supreme Court held that although there was evidence that there was substantial competition in the sale of copiers, there could be relevant markets confined to the servicing of Kodak copiers (as opposed to servicing of all copiers) and confined to the sale of Kodak's spare parts, because there were facts in the record to support the ISOs' contention that the parts and servicing of Kodak copiers were unique. *See* 504 U.S. at 481–82, 112 S.Ct. 2072.[22]

---

21. Plaintiff also alleges attempted monopolization. In order to prevail on an attempted monopolization claim under the Sherman Act, a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power. *See, e.g., Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.*, 185 F.3d 154, 157 (3d Cir. 1999). In order to determine whether there exists a dangerous probability of achieving monopoly power, a court must inquire "into the relevant product and geographic market and the defendant's economic power in that market." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir.1997) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)). In light of the Court's disposi-

tion of Plaintiff's monopolization claim, the Court need not separately consider the claim of attempted monopolization.

22. There are many cases in which other district courts have found replacement markets limited to the products of a single supplier where they are unique and have no reasonably interchangeable substitutes. *See, e.g., U.S. Anchor Mfg., Inc. v. Rule Indus.*, 7 F.3d 986, 997–98 (11th Cir.1993) (considerably more expensive anchor excluded from broader market of functionally interchangeable but up to 50% less expensive anchors), *cert. denied*, 512 U.S. 1221, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994); *Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1305–07 (5th Cir.1971) (concluding that single natural gas field constituted relevant market), *cert. denied*, 404 U.S. 1047,

In Plaintiff's submission on *Kodak*, as to the claim of monopolization, Plaintiff asserts that *Kodak* squarely rejects any concept that a defendant with a natural monopoly cannot be guilty of monopolization. However, Plaintiff goes on to argue that the Defendants' marketing strategy was similar to Kodak's and that Defendants used their control over the contents of their air worthiness manuals (the ICAs) to expand their control into the replacement fabric market, and that Defendants, as Kodak, utilized the monopoly they initially enjoyed as a result of having created a new product in order to perpetuate their monopoly improperly and to destroy competition.

Plaintiff also asserts that the testimony of Mr. Waligunda (Pl.'s Ex. F, at 17–19, 23–25) establishes that Defendants intended to utilize its market power to gain a competitive advantage and to destroy a competitor. Plaintiff argues that the *Kodak* decision requires this Court to defer to a jury trial for resolution of Defendants' assertion that their exclusionary practices were necessary to maintain service for sophisticated equipment, and to ensure safety of balloon owners and riders.

Defendants' submission on *Kodak* acknowledges the holding, but attempts to distinguish the facts, which have been reviewed above. Defendants assert that the facts of this case do not rise to the level which the Supreme Court found in *Kodak* to require a trial on either monopolization or the tying claim, and that Plaintiff's claim must be considered economically senseless, once again relying on the federal regulation and/or oversight as negating any conceivable antitrust theory.

Based on *Kodak* and its progeny, this Court is unable to hold as a matter of law that there cannot be, in the abstract, for Section 2 monopolization charges, a separate product market limited to Raven/Aerostar balloon envelope replacement fabrics.[23] However, that does not end the Court's inquiry as to whether plaintiff has submitted sufficient evidence, in opposition to Defendants' Motion for Summary Judgment, to warrant a trial on the issue of monopolization.

In *Kodak*, looking from the perspective of Kodak equipment owners, the Supreme Court concluded that the relevant market was composed only of those companies that serviced Kodak machines, as the service and parts for Kodak equipment were not interchangeable with service and parts for the original equipment of other manufacturers. *Kodak*, 504 U.S. at 482, 112 S.Ct. 2072.

This Court concludes that there is insufficient evidence in the record to support such a finding. First, the record is undisputed that Defendants did not have any monopoly power in the sale of balloons, as there were a number of manufacturers of balloons (consisting of the entire balloon, that is the "basket" and the "envelope"). Gregory Michalik, quoted by both parties as a knowledgeable FAA official, identified Cameron Balloons, U.S., and Lindstrand U.S.A. as competing hot air balloon manu-

92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *Hewlett–Packard Co. v. Arch Assocs. Corp.*, 908 F.Supp. 265, 270 (E.D.Pa.1995) (complaint adequately pleaded relevant product market, even where market limited to distribution of Hewlett–Packard computer printers); *Nat'l Communications Ass'n, Inc. v. AT & T Co.*, 808 F.Supp. 1131, 1135 (S.D.N.Y.1992) (denying motion to dismiss because "a monopolist, or person at-tempting to monopolize, can be found liable in regard to distribution of its own product if it is (1) illegally attempting to destroy competition by refusing to deal or (2) controlling an essential service or bottleneck").

**23.** There does not appear to be any dispute that the geographic market is the entire United States.

facturers. (Michalik Dep., Defs.' Ex. G, at 12.) Mr. DiGiovanni identified Balloon Works and Thunder & Colt as competing hot air balloon manufacturers. (DiGiovanni Dep., Pl.'s Ex. B, at 23–24.) Mr. Waligunda identified Picard as another competing hot air balloon manufacturer. (Waligunda Dep., Pl.'s Ex. F, at 16.) It is unclear from the record whether Harrison Aire had purchased any balloons from any third-party manufacturers. There was nothing to prevent him from doing so.

Although there is evidence in the record that Defendants may have misrepresented the facts by implying that owners or users of their balloons had to purchase replacement envelopes from Defendants (*see* discussion above), the evidence is clear that this was not a requirement of the FAA. Plaintiff had reason to know Defendants' statements were not FAA-mandated, as Mr. Harrison testified that the FAA authorized third-parties to sell Raven/Aerostar replacement parts through the PMA and STC processes. (Harrison Dep., Pl.'s Ex. H, at 164.) Mr. Harrison testified that he believed the FARs required total compliance with Defendants' manual (Harrison Dep., Defs.' Ex. C, at 51), but his interpretation overlooks the distinction, well articulated in this record, and discussed above, between the ICA and the ALS portions. Mr. Harrison also testified that he knew, back when the "big ride" balloon required repairs to remain flyable, that Head Balloons and Custom Nine Designs sold replacement balloon envelopes (Harrison Dep., Defs.' Ex. D, at 13; Harrison Dep., Defs.' Ex. B, at 124–28.) Mr. Harrison's testimony does not indicate any awareness that other operators of balloons purchased replacement fabrics from entities other than the manufacturer of the balloon, but other witnesses' testimony describes purchases from third-parties. (*E.g.*, Waligunda Dep., Pl.'s Ex. F, at 28.) Thus, the *Kodak* facts do not fit.

Further, in *Kodak*, there was additional anticompetitive conduct by Kodak which the Supreme Court held required a trial on the overall issue of monopolization. *See* 504 U.S. at 483, 112 S.Ct. 2072 ("[R]espondents have presented evidence that Kodak took exclusionary action to maintain its party monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market."). There is insufficient evidence in the record to show that defendants achieved monopoly power in the replacement market, by virtue of conduct illegal under Section 2.

Thus, the record shows only that Plaintiff had the subjective belief that it thought it had to purchase replacement envelopes from Defendants. However, this subjective belief does not, in and of itself, entitle Plaintiff to a trial on this issue. "[C]onclusory statements, hearsay, and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence." *Frosty Bites, Inc. v. Dippin' Dots, Inc.*, No. 3–01–CV–1532–M, 2003 WL 21196247, at *2, 2003 U.S. Dist. LEXIS 8472, at *8 (N.D.Tex. May 19, 2003); *see also McKnight v. Sch. Dist. of Phila.*, 171 F.Supp.2d 446, 448 (E.D.Pa. 2001) ("Unsubstantiated and subjective beliefs and opinions are not competent summary judgment evidence.") (quotation omitted). There is no objective evidence in the record that supports Plaintiff's misunderstanding or misconception of the requirements for replacement fabric. If, as Plaintiff contends, the Defendants had a plan of persuading all other balloon owners that they had to buy replacement fabric for Defendants' balloons only from Defendants, the plan did not succeed.

There is abundant testimony in the record that other balloon owners knew they could buy replacement fabric from entities other than the manufacturer, and that they

did so. The record shows that other balloon owners knew they were not obligated to purchase Defendants' replacement fabric in repairing their Raven/Aerostar hot air balloons; other balloonists purchased third-party fabric for their Raven/Aerostar hot air balloons. While one replacement fabric competitor (Head Balloons) had not been advertising too heavily, Custom Nine Designs had been loudly promoting itself by sending letters to Defendants' distributors and advertising its services in industry magazines. (Waligunda Dep., Pl.'s Ex. F, at 27–28.) Mr. Waligunda, a distributor for Defendants, testified that Defendants sought to put Custom Nine Designs out of business because "from a competitor's standpoint, [Custom Nine Designs] was hurting [Defendants'] sales." (*Id.* at 28.) This statement implies that other hot air balloon owners were buying replacement fabric from others. Moreover, in their newsletter sent to Raven/Aerostar balloon owners, Defendants published test data that purportedly demonstrated the superiority of Defendants' own fabrics compared to those of their competitors in order to convince their readership to remain loyal to Defendants' product line. (West Aff. of Jan. 2004, Ex. A, at 5.) Defendants would not have published these comparisons had they not felt commercially threatened by the presence and availability of these competing fabrics. Mr. Harrison himself testified that he had contemplated purchasing less expensive third-party fabric from Colvin Rouse and other distributors, but never did so, believing that Defendants' ICA forbade him from using other replacement fabrics. (Harrison Dep., Defs.' Ex. D, at 43–44.)

The Court finds that Defendants' ICA did not forbid Plaintiff from purchasing other manufacturers' fabric and that a reasonable investigation on this point by Plaintiff would have disclosed, accurately, the relevant regulatory environment and that Plaintiff could buy replacement fabric from anyone who manufactured them to the FAA standards.

This Court concludes it would be error to transform Defendants' statements in their ICA into an antitrust violation. Further probing by Plaintiff, rather than mere reliance on the admitted ambiguity of Defendants' ICA, would have revealed that there was no bar to Plaintiff's securing replacement fabric from other sources. Plaintiff cites no case allowing mere ambiguities or misrepresentations to become an antitrust violation.

Returning to the concept of market power in a relevant market, there is no dispute that Raven/Aerostar was one of several manufacturers of hot air balloons. (*See, e.g.,* Michalik Dep., Defs.' Ex. G, at 12, identifying Cameron Balloons, U.S., and Lindstrand U.S.A. as market competitors; DiGiovanni Dep., Pl.'s Ex. B, at 23–24, identifying Balloon Works and Thunder & Colt; Waligunda Dep., Pl.'s Ex. F, at 16, identifying Picard.) As noted above, there is no evidence whatsoever that Defendants had a monopoly share of the sales of hot air balloons themselves. Assuming *arguendo* that Plaintiff reasonably believed replacement parts for Defendants' hot air balloons had to be purchased from Defendants alone, that does not necessarily make Defendants monopolists in the sale of replacement parts. The Supreme Court in *Kodak* did state that a market is defined with reference to reasonable interchangeability. 504 U.S. at 481–82, 112 S.Ct. 2072. In *Kodak*, the Supreme Court held that the market for repair parts and services for Kodak photocopiers was a valid relevant market because repair parts and services for Kodak machines are not interchangeable with the service and parts used to fix other copiers. *Id.* As the Supreme Court said, it is the reasonable perception of the purchasers in the marketplace that

are relevant in determining interchangeability.

In this case, the objective evidence is clear that replacement fabrics manufactured by others are interchangeable with Defendants' replacement fabric for Raven/Aerostar hot air balloons. Both Head Balloons and Custom Nine Designs were authorized by the FAA to sell replacement parts specifically for Defendants' hot air balloons. (*E.g.*, Waligunda Dep., Pl.'s Ex. F, at 21–22, 26.) There is no evidence in the record, other than Plaintiff's own mistaken beliefs, to support finding a lack of interchangeability. Indeed, it is not the fact of interchangeability that is in dispute here, but it is only that Defendants are alleged to have misrepresented the fact of interchangeability. However, the misrepresentations do not themselves become antitrust violations because there is no evidence that the Defendants had market power in the sale of hot air balloons themselves, or in the overall sale of replacement fabric.

It would not be an antitrust violation for Defendants falsely to assert that the purchaser of their hot air balloons should use only Defendants' replacement parts. In *Queen City Pizza, Inc. v. Dominos Pizza, Inc., supra,* the Third Circuit affirmed summary judgment dismissal of an antitrust complaint where the plaintiff had alleged an illegal tie in the sale of products associated with a pizza franchise and required by the contractual documents existing between the parties. On the issue of the relevant product market, the court said the inquiry must be

> whether pizza makers in general might use such products interchangeably. Clearly, they could. Were we to adopt plaintiffs' position that contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, any exclusive dealing arrangement, output or requirement contract or franchise tying agreement would support a claim for violation of the antitrust laws.

124 F.3d at 438. Applying that holding to his case, the Court cannot conclude that, assuming Defendants made misrepresentations in their marketing efforts, these misrepresentations can alter what the market realities were in terms of defining the relevant product market.

The Third Circuit distinguished *Kodak* as follows:

> *Kodak,* we believe, held that a plaintiff's proposed relevant market in a unique and non-interchangeable derivative product or service cannot be defeated on summary judgment by a defendant's assertion that the proposed derivative market is cross-elastic with the primary market, if there is a reasonable possibility that the defendant's assertion about cross-elasticity is factually incorrect.... Here, it is uncontroverted that Domino's approved supplies and ingredients are fully interchangeable in all relevant respects with other pizza supplies outside the proposed relevant market. For this reason, dismissal of the plaintiffs' claim as a matter of law is appropriate.

124 F.3d at 439–40.

The Court also notes that there is no evidence in this record of some of the other indicia of a monopoly, such as increasing prices, reduced competition, or difficulty of entry into the marketplace. The evidence is uncontradicted that several other hot balloon manufacturers became active competitors of Defendants during the time period, and also the market for replacement fabrics expanded, and other entities became involved in selling replacement fabrics for different manufacturers' balloons. (*See, e.g.*, West Aff. Of Nov. 2003 ¶ 13; Waligunda Dep., Pl.'s Ex. F, at 21–22, 26.) Furthermore, any evidence on

pricing is minimal. Plaintiff contends that Defendants priced its replacement fabric at a higher price than available elsewhere, but there is no other indication of any other pricing behavior by the Defendants or price levels in the market in the record.

### 2. Section 1 Tying Claim

Count II of Plaintiff's complaint charges an antitrust tying arrangement, and alleges in paragraph 38, "Defendants possessed monopoly power in the market for the tying product (Aerostar hot air balloons) and used this monopoly power to restrain trade in the tied product (replacement fabric for Aerostar balloon envelopes)." Plaintiff's tying charges are not specifically identified to either Section 1 or Section 2, but the law is clear that a tying claim can be made under both Sections 1 and 2.[24] *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F.Supp. 455, 472 n. 26 (S.D.N.Y.1996), *Caldera, Inc. v. Microsoft Corp.*, 72 F.Supp.2d 1295, 1328 (D.Utah 1999), *In re Indep. Service Orgs. Antitrust Litig.*, 114 F.Supp.2d 1070, 1082 n. 6 (D.Kan.2000). In *Kodak*, the tying claim was clearly brought under § 1.[25]

Defendants deny there was any condition that Defendants' replacement fabric had to accompany the purchase of a new balloon from Defendants, nor any condition that replacement parts be purchased only from Defendants.

### b. Analysis

"In a tying arrangement, the seller sells one item, known as the tying product, on the condition that the buyer also purchases another item, known as the tied product." *Allen–Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 200 (3d Cir.1994). "The antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not, thereby restraining competition in the tied product market." *Id.*

In support of their argument that Plaintiff cannot establish its prima facie case for a tying arrangement. Defendants cite Mr. Harrison's deposition testimony that he had options to purchase balloon fabric from any number of Aerostar distributors, and at times did so at half price. (Harrison Dep., Defs.' Ex. B, at 112–13.) Defendants contend that Plaintiff also had PMA and STC options, 14 C.F.R. § 21.303, but opted not to pursue them. Defendants contend that there is no evidence that indicates that Aerostar controlled a particular market share within what is clearly a market which is subject to significant regulation. Plaintiff responds that its tying arrangement allegation remains viable as Defendants required purchasers to accept burdensome terms that could not be exacted in a competitive market: i.e., to search for fabric that had been "tested and ap-

---

**24.** The Court notes some pleading issues relating to the tying claims in Plaintiff's complaint. In paragraph 4, Plaintiff asserts that it brings this case "by reason of Defendants' violation of § 1 of the Sherman Act, 15 U.S.C. § 1." Because Plaintiff has cited both Sections 1 and 2 in his complaint, and given the requirements of liberal construction of pleadings under the Federal Rules, the Court will consider Plaintiff's tying claims as brought under both Sections 1 and 2.

**25.** In Plaintiff's brief on the *Kodak* issue, the Plaintiff also seeks to cite Section 3 of the Clayton Act, 15 U.S.C. § 14, as support for the tying claim. However, because there is no mention of Section 3 of the Clayton Act in Plaintiff's complaint, the Court will, therefore, not consider it. However, this is not prejudicial to Plaintiff as such a statutory basis for a tying claim would be redundant to the claims stated under Sections 1 and 2 of the Sherman Act.

proved according to Raven factory standards," or to obtain permission before performing a top-half fabric replacement.

■ Under the tying allegation, the Court first notes that the Complaint alleges that the defendant possessed monopoly power in the market for the tying product (Aerostar Hot Air Balloons) (Compl.¶ 38), but there is no evidence in the record to support a single brand market of hot air balloons. "Relevant markets generally cannot be limited to a single manufacturer's products." ABA ANTITRUST, *supra*, at 566 (noting exception only for some after-market cases). *See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3d Cir.) (en banc), *cert. denied*, 506 U.S. 868, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992). The evidence shows, to the contrary, that Defendants had several competitors in the sales of balloons. (Michalik Dep., Defs.' Ex. G, at 12.) As noted above in the Section 2 discussion, there is no evidence that Defendants had monopoly power in the sale of the balloons, usually defined as a large percentage of the relevant market. There cannot be an illegal tie without monopoly power over the tying product. *Kodak*, 504 U.S. at 464, 112 S.Ct. 2072.[26]

In the *Kodak* case, Kodak urged that because it did not have a monopoly in the sale of original equipment, it could not be liable for tying its replacement parts and the tied product service. The Supreme Court concluded that in *Kodak* the record showed that the ISOs were facing Kodak market power in the service and parts markets, and that the evidence allowed an inference that Kodak had market power to raise prices and drive out competition in

the after-markets, and had presented evidence that Kodak did exactly that. This evidence consisted of noting that market power existed because of locked-in customers, high information costs and discriminatory pricing. 504 U.S. at 477–78, 112 S.Ct. 2072.

To the contrary, the record in this case does not disclose any relation between parts and service, or other industry-wide anticompetitive practices, such as increasing market shares, locked-in customers, high information costs or any evidence about pricing other than Plaintiff's limited evidence that replacement fabric available from Defendants was priced higher than replacement fabric available from other purveyors. There is no evidence in the record that the quality was exactly the same. The record would only allow an inference that Defendants charged more for their replacement fabric because Plaintiff (and perhaps other potential customers who owned or operated hot air balloons) thought they had to buy the replacement fabric from Defendants. But the record does not allow an inference this higher price was due to an illegal tie.

In *Kodak*, the Supreme Court noted evidence that Kodak had agreed to sell parts to third parties only if they had agreed not to buy service from the ISOs. There were also many other restrictions instituted by Kodak as to the sale of replacement parts, all designed to put economic pressure on users of Kodak copiers to use Kodak's own service personnel. In the present case, there are no issues or contentions concerning service.

In *Kodak*, the Supreme Court held that there was a factual issue for trial as to

---

**26.** It is important to note that in *Kodak* the plaintiffs did not allege that the tying product was Kodak copiers, but alleged that service and parts are two distinct markets, and that Kodak had used its monopoly power over the

parts market as the tying product, to compel the owners and users of Kodak equipment to use Kodak's own service personnel, rather than ISOs.

whether Kodak had appreciable economic power in the tying market, i.e., the market for replacement *parts* for Kodak copiers. In *Kodak,* the Court related in detail why there could be a separate product market for replacement parts for Kodak copiers. In fact, in *Kodak,* there was really no dispute that replacement parts for Kodak machines were unique and not interchangeable with other copiers.

In the present case, this product distinctiveness is lacking. There is no evidence that only Defendants' replacement fabric could be used on Defendants' hot air balloons. Although Defendants did claim at various times that the owner of their balloons should use their replacement fabric, and even asserted that the FAA required this, there is nothing in the record to show that, in fact, for scientific, safety or any other reason, only Defendants' replacement fabric could be used on Defendants' hot air balloons.

The Court notes in passing that the Complaint alleges two separate markets. The market alleged in Count I for Section 2, as noted above, is the "Raven/Aerostar hot air balloon replacement fabric market" whereas under Count II, charging tying, the tying product is alleged to be Aerostar hot air balloons, but the tied product is, with only slightly different descriptive language, alleged to be the same market as in Count I, charging monopolization and attempted monopolization.[27]

As noted above, the Supreme Court rejected as a matter of law Kodak's contention that a single brand of product or service can never be a relevant market, holding "[t]he relevant market for antitrust purposes is determined by the

choices available to Kodak equipment owners." 504 U.S. at 481–82, 112 S.Ct. 2072. The Court accepted as a fact, based on the record in *Kodak,* that parts for Kodak equipment are not interchangeable with other manufacturers' parts, and thus, there was an issue of whether Kodak used its parts sales as a tie to service its equipment owners to use Kodak service. Thus, the relevant market from the Kodak equipment owners perspective is composed of only those companies that service Kodak machines. *Id.*

The evidence in this case does not allow the Court to reach such a conclusion, because there is an acknowledgment running throughout the case that the replacement envelopes manufactured by any company and meeting standards are in fact interchangeable with Defendants' replacement fabric, and that some balloon owners realized this, and purchased replacement envelopes from competing manufacturers. (*See supra* pp. 216–217.) The record discloses that it was only because of the alleged fraud by Defendants toward Plaintiff that Plaintiff believed that it had to buy replacement envelopes from Defendants. For this reason, the Court concludes that Plaintiff's evidence does not show a "tie."

### 3. Whether Plaintiff Has Been Injured by Reason of Defendants' Violation of the Antitrust Laws

█ The Court notes another defect with Plaintiff's claims. Under the antitrust laws, a plaintiff can only sue for injuries sustained as a result of that forbidden by the antitrust laws. Here, Plaintiff's damages, if any, arise out of fraud,

---

27. There is a certain inconsistency in Plaintiff's definitions. If Defendants indeed have a monopoly of the replacement fabric market, as alleged in Count I for monopolization purposes, it is hard to understand how Defen-

dants would need the help of a "tie", i.e., the forced sale of replacement fabric, as a "tied" product. However, inconsistent contentions, particularly in the summary judgment context, are not fatal.

not out of the abuse of market power by Defendants. Thus, the Court concludes Plaintiff has not suffered "antitrust injury."

Mr. Harrison testified during his May 13, 2003 deposition regarding his opinion whether Defendants' manuals were deliberately misleading and what effect the manuals had on his behavior. Mr. Harrison stated "[t]hat Raven clearly in their manuals said that you could not use anything other than Raven fabric." (Harrison Dep., Pl.'s Ex. H, at 151.) Mr. Harrison testified:

> There was fabric available on the outside market that was also being represented as being the same manufacturer [sic] of Raven, and that it was available to the ... balloon public, if you wanted to—if you wanted to buy it. . . . But when I came up with any—brought the question up to Aerostar—or Raven, they said if it doesn't come from us, if you don't have an invoice from us ... it's not Raven fabric, and it's in violation of the FAA 43, and it's unairworthy.

(Id. at 152–53.) His deposition continued as follows, in pertinent part:

Q. What was your particular complaint to Raven then if you didn't believe it was misleading? What was your particular complaint?

A. The complaint was if—if the manufacturer is providing or a supplier is providing the same material to Raven, and it's available directly at half the cost to someone else, same fabric, and the same factory is saying, "We make it for Raven, and the same specs coming off the same mills, the same run, the same colors and everything. We'll provide it to you directly."

Q. Would it be—go ahead. You finish.

A. And Raven said, "No. You can't do that."

(Id. at 157.) Mr. Harrison thought he ought to be able to purchase fabric from another source and he believed that the particular guidelines set forth in the Raven manual forbade him from doing so. (Id. at 158.) Mr. Harrison testified that he had contemplated purchasing less expensive third-party fabric from Colvin Rouse and other distributors, but never did so, believing that Defendants' ICA restricted him from using other people's fabrics. (Harrison Dep., Defs.' Ex. D, at 43–44.)

Mr. Harrison testified that he had frequently asked Defendants' representatives whether the policy regarding replacement fabric had changed, and, according to Mr. Harrison, the representatives responded, " 'As long as you buy the fabric, we don't care what you do,' basically. The emphasis, 'buy the fabric.' " (Harrison Dep., Pl.'s Ex. H, at 161.) As Mr. Harrison testified, even though Plaintiff would have preferred using third-party fabric, because it believed that federal law required its compliance, Plaintiff continued purchasing Raven/Aerostar fabric:

Q. Did you believe Raven was requiring you to purchase fabric only from Raven?

A. Yes.

Q. Did you believe that they had the authority to do that?

A. Yes.

Q. Did you make any investigation with the FAA or any other source as to whether or not they indeed had the authority to do that?

A. It was an FAA document that said you have to do that.

Q. What FAA document said that they had to do it?

**A. The manual said if you don't use Raven, Aerostar fabric your balloon is unairworthy. It's on an FAA document.**

(*Id.* at 163.) The "FAA document" to which Mr. Harrison refers is Defendants' ICA itself, which, as stated above, is only reviewed by the FAA before publication and promulgation. Mr. Harrison continued to believe that the FAA had authorized Defendants to forbid its customers from patronizing third-party suppliers until he received a forwarded copy of an FAA letter, contradicting Defendants' position. (*Id.* at 162.) This "letter from Gallagher," as Mr. Harrison referred to it, does not appear in the exhibits submitted to the Court. As noted above, Mr. Harrison's belief was simply unfounded. That his belief was caused by Defendants' misrepresentation does not establish antitrust injury. In addition to his presumed inability to purchase third-party replacement fabric, Mr. Harrison testified that he abandoned plans to design and replace his own balloon fabric and to sell his excess fabric to other balloonists, because he independently concluded that this venture would have been professionally difficult given Defendants' ICA language limiting use of third-party fabric, but he could not say that an FAA representative had told him he could not pursue the venture unless Defendants retracted their ICA. (Harrison Dep., Defs.' Ex. D, at 48–50.)

Plaintiff has submitted evidence (including an expert's report) that it has suffered damages due to Defendants' allegedly fraudulent misrepresentations, but Plaintiff has not supported its antitrust claims with evidence that it suffered injury of the type that the antitrust laws were intended to prevent, and that flows from that which makes the defendants' acts unlawful, as required by the landmark ruling in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In *Brunswick*, independent bowling centers brought an antitrust action against the Brunswick Corporation, then one of the two largest bowling equipment manufacturers and the largest operator of bowling centers. Brunswick had been selling bowling equipment to the plaintiffs' competitors on credit, and had started acquiring the financially unstable alleys when they defaulted in payments. The *Brunswick* plaintiffs claimed that Brunswick's acquisitions might substantially lessen competition or tend to create a monopoly under Section 7 of the Clayton Act, which prohibits mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly."

The issue in *Brunswick* was "whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying [the plaintiffs] an anticipated increase in market shares." 429 U.S. at 484, 97 S.Ct. 690. The parties did not contest the lower court's determination that the acquisitions were unlawful; nor did the parties contest the lower court's determination that had Brunswick not acquired these properties that the moribund companies would have gone out of business, thus increasing the plaintiffs' income. *Id.* However, the Court concluded that the lower court had erred in determining that once a merger occurred in violation of Section 7, that all dislocations caused thereby are automatically actionable, regardless of whether the consequences had anything to do with the reason the merger was condemned. *Id.* at 487, 97 S.Ct. 690. As the Court explained, "Every merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some person. But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects." *Id.*

Regarding the instant case, this Court only can conclude that Plaintiff has not presented sufficient evidence to show a

genuine issue of fact that he suffered any *antitrust* injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. 690. Assuming *arguendo* that Plaintiff established liability, Plaintiff has not produced anything of record that would demonstrate that its injury reflects the anticompetitive effect either of the violation, or of anticompetitive acts made possible by the violation. *Id.* Simply put, Plaintiff has adduced no evidence demonstrating that its damages followed an antitrust violation and were caused by that characteristic which made the violation one sounding in antitrust.

The Third Circuit has applied the *Brunswick* rule in several cases. In *Alberta Gas Chemicals, Ltd. v. E.I. Du Pont Nemours & Co.*, 826 F.2d 1235 (3d Cir. 1987), the Third Circuit affirmed a grant of summary judgment on *Brunswick* grounds, holding that plaintiffs must prove more than harm causally linked to an illegal presence in the market, but that antitrust injury must reflect the anticompetitive effect, either of the violation or anticompetitive acts made possible by the violation. 826 F.2d at 1240. In this case, Plaintiff's injuries have nothing to do with Defendants' market power, but rather relate to the contention that Defendants misrepresented the FAA regulations in its ICAs, and made (at least) Plaintiff, as a prospective purchaser, believe that Plaintiff had to buy its replacement fabric from Defendants. Any injuries that Plaintiff suffered would have come from Defendants' misrepresentations, not from any market power, abuse of market power or other anticompetitive conduct. *See also Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318 (3d Cir.1992) (granting summary judgment on this ground, albeit with different facts).

### 4. Whether Plaintiff Has Shown Any Impact on Competition Generally

It is axiomatic that as part of its *prima facie* case, a plaintiff must show that the conduct of the defendant restrained competition generally, in addition to causing plaintiff harm. *See generally* ABA ANTITRUST, *supra*, at 61–73. The Third Circuit has said, "mindful that antitrust law aims to protect competition, not competitors, we must analyze the antitrust injury question from the viewpoint of the consumer." *Alberta Gas Chems., Ltd.*, 826 F.2d at 1242. In this case, evidence showing a diminution of competition from the viewpoint of the consumer is sparse. However, the Court need not consider the issue in view of the holdings above.

## V. Conclusion

The Court concludes that whether the applicable statute of limitations had expired before Plaintiff filed its Complaint remains an issue of fact for trial. The Court also rejects Defendants' argument that summary judgment is warranted upon application of implied immunity to Plaintiff's antitrust claims. However, as the Court concludes that Plaintiff has failed to substantiate its *prima facie* case regarding its monopoly and tying arrangement allegations, the Court will grant Defendants' Motion for Summary Judgment. As to Plaintiff's negligence and fraud claims, the defendants' Brief did not discuss or refute them. Therefore, the Court cannot grant summary judgment on these claims. In light of the holdings above, the Court will have a final pre-trial conference on the state law claims promptly.

An appropriate order follows.

### ORDER

AND NOW, this 30th day of April, 2004, upon consideration of Defendants' Motion

for Summary Judgment (Docket No. 12), it is hereby ORDERED that Defendants' Motion is GRANTED as to Counts I and II. The Court will have a final pre-trial conference on the remaining claims on Friday, May 7, 2004, at 2 p.m. by telephone.